UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION,

PEOPLE OF THE STATE OF CALIFORNIA,

STATE OF COLORADO,

STATE OF FLORIDA,

PEOPLE OF THE STATE OF ILLINOIS,

COMMONWEALTH OF MASSACHUSETTS, and

PEOPLE OF THE STATE OF STATE OF NEW YORK,

       Plaintiffs,

       v.

ROOMSTER CORP., a corporation,

JOHN SHRIBER, individually and as an officer of Roomster Corp.,

ROMAN ZAKS, individually and as an officer of Roomster Corp., and

JONATHAN MARTINEZ, individually and doing business as AppWinn,

       Defendants.

**Case No. 1:22-cv-7389**

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................................. 1

II.     BACKGROUND ............................................................................................................... 1

III.    ARGUMENT ..................................................................................................................... 2

        A.      The FTC Has Sufficiently Pled That It Has Reason to Believe
                Defendants Are Violating or Are About to Violate the Law .................................. 3

        B.      The FTC Has the Authority to Initiate This Lawsuit .............................................. 8

        C.      There Is Clearly a "Case or Controversy" .......................................................... 10

        D.      The Court Can and Should Exercise Supplemental Jurisdiction over the
                Plaintiff States' Claims ........................................................................................ 11

        E.      The Plaintiff States Have Properly Pled Their Deceptive Practices Claims ......... 13

        F.      Defendants' Constitutional Challenge to the Potential Scope of a State Law
                Restitution Remedy Is Procedurally Premature and Substantively Meritless ...... 16

        G.      Counts III and IV Regarding Defendants' Fraudulent and Illegal
                Conduct under New York Law Are Sufficiently Pled .......................................... 20

        H.      Section 230 of the CDA Is Inapplicable .............................................................. 23

IV.     CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Ackerman v. Nat'l Prop. Analysts, Inc.*, 887 F. Supp. 494 (S.D.N.Y. 1992) .............................. 13

*Agostini v. Felton*, 521 U.S. 203 (1997) ...................................................................................... 8

*Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107 (9th Cir. 2021) ................................................ 15

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................... 16

*Aspinall v. Phillip Morris Cos.*, 813 N.E.2d 476 (Mass. 2004) .................................................. 14

*Bowsher v. Synar*, 478 U.S. 714 (1986) ....................................................................................... 8

*Burkina Wear, Inc. v. Campagnolo, S.R.L.*, No. 07-cv-3610, 2008 WL 1007634
    (S.D.N.Y. Apr. 9, 2008) ........................................................................................................ 17

*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016) ................................................................. 11

*CFPB v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729 (S.D.N.Y. 2018) ................................... 21

*City Carting, Inc. v. New York City Bus. Integrity Comm'n*, No. 14 CIV. 8582 PAC,
    2014 WL 6604053 (S.D.N.Y. Nov. 13, 2014) ...................................................................... 18

*Collins v. Yellen*, 141 S. Ct. 1761 (2021) ............................................................................. 8, 10

*Cruz v. FXDirectDealer, LLC*, 720 F.3d 115 (2d Cir. 2013) ...................................................... 21

*Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169 (10th Cir. 2015) ................................... 17, 18

*Eric M. Berman v. City of N.Y.*, 895 F. Supp. 2d 453 (E.D.N.Y. 2012),
    *vacated and remanded on other grounds*, 796 F.3d 171 ...................................................... 18

*Force v. Facebook*, 934 F.3d 53 (2d Cir. 2019) ......................................................................... 24

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010) ...................................... 8

*Freedom Holdings Inc. v. Spitzer*, 357 F.3d 205 (2d Cir. 2004) .................................... 18, 19, 20

*FTC v. Agora Fin, LLC*, 447 F. Supp. 3d 350 (D. Md. 2020) ....................................................... 4

*FTC v. Educare Centre Servs.*, Inc., 433 F. Supp. 3d 1008 (W.D. Tex. 2020) ............................. 5

*FTC v. Evans Prods.*, 772 F.2d. 1084 (9th Cir. 1985) .................................................................. 6

*FTC v. Hornbeam Special Situations, LLC*, 391 F. Supp. 3d 1218 (N.D. Ga. 2019) .................... 6

*FTC v. Hoyal & Assocs., Inc.*, 2021 WL 2399707 (9th Cir. June 11, 2021) ................................. 6

*FTC v. LeadClick Media, LLC*, 838 F.3d 158 (2d Cir. 2016) .................................................. 23, 24

*FTC v. Sage Seminars*, No. C-95-2854 SBA, 1995 U.S. Dist. LEXIS 21043
   (N.D. Cal. Nov. 2, 1995) ................................................................................................. 5

*FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019) ....................................................... 3

*FTC v. Va. Homes Mfg. Corp.*, 509 F. Supp. 51 (1981), *aff'd without opinion*,
   661 F.2d 920 (4th Cir. 1981) ........................................................................................... 4

*FTC v. Vyera Pharms., LLC*, 479 F. Supp. 3d 31 (S.D.N.Y. 2020) ......................................... 3, 6

*FTC v. Vyera Pharms., LLC*, No. 20CV00706 (DLC), 2021 WL 4392481
   (S.D.N.Y. Sept. 24, 2021) ............................................................................. 11, 20, 21

*Goshen v. Mut. Life Ins. Co.*, 774 N.E.2d 1190 (N.Y. 2002) ................................................ 21, 22

*Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158 (2d Cir. 2005) ........................... 18

*Healy v. Beer Institute, Inc.*, 491 U.S. 324 (1989) ................................................................... 18

*Henderson v. Source For Pub. Data*, No. 21-1678, 2022 U.S. App. LEXIS 30534
   (4th Cir. Nov. 3, 2022) .............................................................................................. 23, 25

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) .................................................. 8, 9

*In re Aiken Cnty.*, 645 F.3d 428 (D.C. Cir. 2011) ........................................................................ 8

*In re Sanctuary Belize Litig.*, No. PJM 18-3309, 2019 WL 4243079 (D. Md. Sept. 5, 2019) ....... 5

*Interlink Prod. Int'l, Inc. v. F & W Trading LLC*, No. CV151340MASDEA,
   2016 WL 1260713 (D.N.J. Mar. 31, 2016) ...................................................................... 15

*Jones v. Liberty Mut. Fire Ins. Co.*, No. 3:04-CV-137-MO, 2008 WL 490584
   (W.D. Ky. Feb. 20, 2008) ................................................................................................. 3

*Kasky v. Nike, Inc.*, 45 P.3d 243 (Cal. 2002) ........................................................................... 14

*Matter of People by Schneiderman v. Trump Entrepreneur Initiative LLC*, 137 A.D.3d 409
   (N.Y. App. Div. 2016) ..................................................................................................... 21

*Mistretta v. United States*, 488 U.S. 361 (1989) ......................................................................... 8

*Morrison v. Olson*, 487 U.S. 654 (1988) ..................................................................................... 8

iii

*New York v. Greenberg*, 27 N.Y.3d 490 (N.Y. 2016)..................................................... 16

*Norwalk CORE v. Norwalk Redev. Agency*, 395 F.2d 920 (2d Cir. 1968) ..................................... 17

*Osborn v. Haley*, 549 U.S. 225 (2007) ....................................................................... 12

*Osborn v. Ozlin*, 310 U.S. 53 (1940) ......................................................................... 20

*Pavers & Rd. Builders Dist. Council Welfare Fund v. J. Pizzirusso Landscaping Corp.*, No. 14-CV-04186 (MDG), 2018 WL 2186481 (E.D.N.Y. May 11, 2018) ............................. 17

*People ex rel. Hartigan v. Knecht Servs., Inc.*, 575 N.E.2d 1378 (Ill. App. Ct. 1991)................ 14

*People ex rel. Spitzer v. Gen. Elec. Co.*, 756 N.Y.S.2d 520 (N.Y. App. Div. 2003).................... 14

*People v. Direct Revenue, LLC*, 862 N.Y.S.2d 816 (N.Y. Sup. Ct. 2008) ................................. 22

*People v. H & R Block Inc.*, 58 A.D.3d 415 (N.Y. App. Div. 2009)........................................... 19

*People v. Lipsitz*, 174 Misc. 2d 571 (N.Y. Sup. Ct. 1997).................................................. 21

*People v. Nat'l Home Protection, Inc.*, 2009 N.Y. Misc. LEXIS 3667 (N.Y. Sup. Ct. Dec. 8, 2009)........................................................................................................ 22

*People v. Telehublink*, 301 A.D.2d 1006 (N.Y. App. Div. 2003).......................................... 19, 22

*Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644 (2003) ...................................... 18

*Purgess v. Sharrock*, 33 F.3d 134 (2d Cir. 1994) ....................................................... 12

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142 (Colo. 2003)........ 14

*SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90 (2d Cir. 1978)............................. 6

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) ................................................. 8, 9, 10

*SPGGC, LLC v. Blumenthal*, 505 F.3d 183 (2d Cir. 2007) ........................................... 18

*State by Abrams v. Camera Warehouse, Inc.*, 130 Misc. 2d 498 (N.Y. Sup. Ct. 1985).............. 20

*State of Fla., Off. of Att'y Gen., Dep't of Legal Affairs v. Commerce Commercial Leasing, LLC*, 946 So. 2d 1253 (Fla. Dist. Ct. App. 2007) ....................................................... 14

*United States v. MyLife.Com, Inc.*, 499 F. Supp. 3d 757 (C.D. Cal. 2020) ...................... 5

*VIZIO, Inc. v. Klee*, 886 F.3d 249 (2d Cir. 2018) ................................................... 17, 18

**Statutes**

15 U.S.C. § 53(b) (FTC Act § 13(b)) ........................................................... passim

28 U.S.C. § 1367 ................................................................................... 11, 12

47 USC § 230 ....................................................................................... 23, 25

815 Ill. Comp. Stat. Ann. 505/2 ..................................................................... 14

Cal. Bus. & Prof. Code §§ 17200-17210 ........................................................... 14

Cal. Bus. & Prof. Code §§ 17500-17536 ........................................................... 14

Colo. Rev. Stat. Ann. § 6-1-105(1) ................................................................ 14

Fla. Stat. Ann. §§ 501.201-.210 ................................................................... 14

Mass. Gen. Laws. Ann. ch. 93A, § 2 ............................................................... 14

N.Y. Exec. Law § 63(12) ......................................................................... passim

N.Y. Gen. Bus. Law § 349 ........................................................................ passim

N.Y. Gen. Bus. Law § 350 ........................................................................ passim

**Other Authorities**

Federal Trade Commission Act, P.L. 63-203, 38 Stat. 717 (1914) ............................... 9

Public Law 73-22 Chapter 38 § 20(b), 48 Stat. 74 (1933) ...................................... 9

U.S. Const. art. II, § 2, cl. 2 .................................................................. 10

## I.   INTRODUCTION

To lure consumers to their room and roommate finder platform, Defendants[1] bait the internet with fake reviews and with fake listings on other sites that redirect consumers to Roomster. Once on the Roomster platform, consumers are met with further misrepresentations about the authenticity and verification of listings. Defendants have relied on this trickery to take tens of millions of dollars from consumers, many of whom are lower-income individuals.

Defendants' deceptive conduct violates multiple state and federal consumer protection laws. Plaintiffs' Complaint[2] pleads those claims with detailed allegations, often quoting specific examples of Defendants' own statements. Defendants nevertheless move this Court to dismiss Plaintiffs' Complaint under Rule 12(b)(6) based on a host of unsupported and inapplicable arguments that are contrary to law and readily debunked by Plaintiffs' Complaint. Because the Complaint provides more than fair notice of Plaintiffs' claims and easily shows a plausible claim for relief, Defendants' motion must fail.

## II.   BACKGROUND

As detailed in the Complaint, "[s]ince at least 2016," Defendants "have inundated the internet with tens of thousands of fake positive reviews to bolster their false claims that properties listed on their Roomster platform are real, available, and verified." Compl. ¶ 3. The Complaint is replete with examples of Defendants' fake-review scheme, including emails directing that reviews be spread out so they are "constant and random," ordering reviews to post in "random" amounts (one email states "We are ready to place an order. 500 reviews for iTunes

---

[1] "Defendants" as used herein refers to Roomster Corp., John Shriber, and Roman Zaks. "Def. Br." refers to the Memorandum of Law in Support of Defendants' Motion to Dismiss (Doc. 44).
[2] Complaint" or "Compl." refers to Plaintiffs' Complaint for Permanent Injunction, Monetary Relief, and Other Relief (Doc. 4). The Plaintiff States, but not the FTC, seek monetary relief.

and 300 for Android for US market . . . Post a random number every day and no more then [sic] 20 for iTunes, 15 for Android, please."), and further instructing that reviews post in "random" amounts to appear "natural" (one email states "Just as a reminder, please make sure it's always a random number of reviews, so it looks more natural"). ¶¶ 33, 36-38; *see also* ¶¶ 3-4, 27-41.[3]

The Complaint further alleges that Defendants "bait the internet with advertisements for fake listings, including on Craigslist" to "further induce consumers to pay for their Roomster platform." ¶ 42. "Through these fake listings, consumers are directed to Defendants' platform and encouraged to sign up and pay a fee to obtain information necessary to secure the rental . . . [only to] learn that the listings that drove them to [Defendants'] platform do not exist." *Id*.

Based on the facts[4] alleged in the Complaint, Defendants' conduct violates federal and state consumer protection laws (Counts I-XV).

## III.  ARGUMENT

Plaintiffs' Complaint pleads more than enough facts to state a plausible claim for relief. As to the FTC's claims, the FTC has sufficiently pled that it has reason to believe Defendants are violating or are about to violate the law; the FTC has the authority to initiate this lawsuit; and there clearly exists a "case or controversy," despite Defendants' attempts to avoid accountability. As to the Plaintiff States' claims, the Court can and should exercise supplemental jurisdiction; the Plaintiff States have sufficiently pled that Defendants' conduct has the capacity to deceive or is likely to deceive consumers; and New York has sufficiently pled its state law counts. Finally,

---

[3] As stated in the Complaint, although Defendants claim they do not pay for reviews (¶ 30), the facts show otherwise. ¶¶ 3-4, 27-41.

[4] Any purported "facts" submitted by Defendants to the contrary (*e.g.*, claiming others are to blame for their own misrepresentations; claiming they ceased activity that they first claimed they never engaged in) (*see* Def. Br. 3-7), come from outside the Complaint, are not subject to judicial notice, are disputed and impertinent, and should be excluded.

as to all claims, Section 230 of the Communications Decency Act does not apply—Plaintiffs

seek to hold Defendants liable for their own misrepresentations, not those made by others.

A.    **The FTC Has Sufficiently Pled That It Has Reason to Believe Defendants Are Violating or Are About to Violate the Law**

Section 13(b) allows the FTC to file suit when it "has reason to believe" a defendant "is

violating, or is about to violate, any provision of law enforced by the [FTC]." 15 U.S.C. § 53(b).

In doing so, the FTC need only allege some facts to support a reasonable inference that it has

such a "reason to believe." *See, e.g.*, *FTC v. Vyera Pharms., LLC*, 479 F. Supp. 3d 31, 43-45

(S.D.N.Y. 2020) (denying a motion to dismiss where the FTC's complaint alleged "reason to

believe" defendants were "still engaged in the alleged violations," and recognizing that "[t]he

FTC is not required to bring suit at the exact moment [the claim ripens]. It is the extant scheme

that provides the basis for the lawsuit.").

1.    The Complaint alleges ongoing law violations.

A plain reading of the Complaint shows that the FTC has met, indeed exceeded, its

burden of stating plausible reasons to believe that Defendants are violating the law.[5]  Plaintiffs'

Complaint, largely in the present and present perfect tenses,[6] describes in detail Defendants'

ongoing and long-lasting wrongful conduct: "Since at least 2016, [Defendants] . . . have

inundated the internet with tens of thousands of fake positive reviews to bolster their false claims

---

[5] Defendants' contention that the Complaint contains only "conclusory allegations" of "long-past conduct," in seeming reliance on *Shire ViroPharma*, a non-binding opinion with distinguishable facts, is entirely misplaced. There, the defendants ceased doing business five years prior and divested their offending product before being sued. *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 156 (3d Cir. 2019). That is far from the case here.

[6] The Complaint's use of the present perfect tense indicates an ongoing activity. *Jones v. Liberty Mut. Fire Ins. Co.*, No. 3:04-CV-137-MO, 2008 WL 490584, at *2 (W.D. Ky. Feb. 20, 2008) (noting complaint uses "present perfect tense which can communicate a continuing situation").

that properties listed on their Roomster platform are real, available, and verified . . . [Defendants] rely on fake reviews . . . and fake listings to get consumers to pay for access to rental information that is unverified and, in many instances, does not exist;" "Through these fake listings [on *e.g.*, Craigslist], consumers are directed to [Roomster] and encouraged to sign up and pay a fee to obtain information necessary to secure the rental. Consumers who sign up soon learn that the listings that drove them to [Roomster] do not exist." Compl. ¶¶ 3-4, 42.

In only one instance, and only after receiving notice of the investigation, have Defendants taken any form of apparent corrective action: "until they received notice of this investigation, [Defendants] claimed on their mobile device applications to have 'millions of verified listings.'" *Id*. at ¶ 24. But despite removing that misrepresentation from their mobile applications just prior to suit, and again only after knowledge of the investigation, the Complaint simultaneously alleges that Defendants "do not verify listings or ensure that their listings are real or authentic" as represented. ¶¶ 25-26. The Complaint further states that, even after receiving notice, Defendants "continued to instruct that reviews post in random amounts in order to appear natural." ¶ 38.

In addition, the Complaint demonstrates that consumer harm from Defendants' conduct is ongoing:[7] "To lend credence to their misrepresentations that their listings are authentic and verified, [Defendants] . . . saturate the internet with tens of thousands of 4 and 5 star fake reviews, including through app stores, where [Defendants] do most of their business;" "App stores provide mobile application users the opportunity to leave customer reviews. Reviews

---

[7] When assessing injunctive relief, courts have found that where harm is ongoing, there is likewise an ongoing violation. *See, e.g.*, *FTC v. Va. Homes Mfg. Corp.*, 509 F. Supp. 51, 57 (1981), *aff'd without opinion*, 661 F.2d 920 (4th Cir. 1981) (defendants took no remedial action after wrongful behavior concluded); *FTC v. Agora Fin, LLC*, 447 F. Supp. 3d 350 (D. Md. 2020) (despite ceasing conduct, harm was ongoing because consumers continued to be impacted).

provide a forum for sharing authentic feedback so consumers can make informed decisions about the products and services they use. Fictitious reviews distort the market. They are also illegal;" "The sheer volume of [Defendants'] fake reviews dilutes reviews from real users." ¶¶ 27-28, 41.

The ongoing law violations alleged in the Complaint clearly satisfy Section 13(b)'s standards. And if there is any dispute about whether illegal conduct was ongoing at the time of suit, this Court should decline to dismiss the FTC's claims. *See FTC v. Educare Centre Servs*., Inc., 433 F. Supp. 3d 1008, 1016-17 (W.D. Tex. 2020) (declining to dismiss where there was a factual dispute about whether conduct had stopped before FTC's lawsuit); *see also In re Sanctuary Belize Litig*., No. PJM 18-3309, 2019 WL 4243079, *7 (D. Md. Sept. 5, 2019) (declining to dismiss where existence of ongoing or future conduct was disputed).

2.   To the extent Defendants have ceased any unlawful conduct, cessation occurred only after knowledge of government investigation and is thus not considered voluntary.

Cessations of violations only after notice of government inquiry are routinely treated as if those violations never stopped or are imminently about to recur. *See, e.g.*, *United States v. MyLife.Com, Inc.*, 499 F. Supp. 3d 757, 767 (C.D. Cal. 2020); *FTC v. Sage Seminars*, No. C-95-2854 SBA, 1995 U.S. Dist. LEXIS 21043, at *16-*17 (N.D. Cal. Nov. 2, 1995) (noting "defendants' claimed cessation of conduct occurred only *after* defendants learned that the FTC had commenced an investigation . . . [so] any cessation on the part of defendants can hardly be considered 'voluntary'") (emphasis in original) (internal citations omitted). As such, any corrective action after knowledge of the investigation, including Defendants' apparent removal of a misrepresentation from their mobile app (Compl. ¶ 24), is not voluntary and is instead

treated as ongoing or imminently about to recur.[8]

### 3.   The Complaint also alleges a likelihood of recurrence.

Even if allegations of ongoing conduct are absent, which they are not, the Complaint

alleges facts sufficient to show that the FTC has reason to believe Defendants are "about to

violate" the FTC Act, because there is a "realistic likelihood of recurrence." *See SEC v.

Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99 (2d Cir. 1978) (applying this standard in the

context of an SEC statute with language substantially similar to Section 13(b)'s "about to"

language).[9] In determining the likelihood of recurrence, courts consider factors such as the

degree of scienter involved; the isolated or persistent nature of past fraudulent acts; the

defendants' appreciation of wrongdoing; and the defendants' opportunities to commit future

violations. *See, e.g.*, *Commonwealth Chem.*, 574 F.2d at 99-100, 102 (applying factors to

determine a "realistic likelihood of recurrence"). When companies are run by the same allegedly

offending individuals, there exists the means and opportunity for future violations. *See Vyera*

*Pharms.*, 479 F. Supp. 3d at 45 (finding individual defendants were violating or about to violate

the law because they designed and implemented the offending system and still held leadership

positions and decision-making power); *Agora*, 447 F. Supp. 3d at 369-70 (defendants had the

ability to restart despite their voluntary cessation over a year before).

---

[8] In improperly trying to argue that the Complaint is stale, Defendants fail to inform the Court of the material fact that Roomster entered into a Tolling Agreement with the FTC that makes any post-investigative corrective conduct inconsequential. A copy of the Tolling Agreement is available to the Court should it wish to take judicial notice of it.

[9] *See also FTC v. Hoyal & Assocs., Inc.*, 2021 WL 2399707, *2 (9th Cir. June 11, 2021) (reliance on *ViroPharma* misplaced where defendants are likely to commit future violations) (citing *FTC v. Evans Prods.*, 772 F.2d. 1084, 1087 (9th Cir. 1985)); *FTC v. Hornbeam Special Situations, LLC*, 391 F. Supp. 3d 1218, 1223 (N.D. Ga. 2019) ("[T]he FTC has alleged facts about past bad behavior which includes a pattern of reoccurrence. Thus, the Complaint sets forth at least some facts to support a reasonable inference that the behavior will reoccur").

In addition to alleging ongoing violations, the Complaint demonstrates a realistic likelihood of recurrence given Defendants' pattern of willful and deliberate behavior over the course of several years and the continued ownership and control by the two named individual Defendants who run the company. For example, the Complaint specifically alleges that Defendants have engaged in unlawful conduct "willfully," "knowingly," "repeatedly," and unabated for a long period of time, "since at least 2016," "despite knowledge of numerous complaints and this investigation." Compl. ¶¶ 3, 45. As alleged in the Complaint, Defendant Shriber personally "instructed [] Martinez to produce 'lots of 5 star IOS app reviews'" and directed Martinez "to spread out the reviews to be 'constant and random.'" ¶¶ 33-38. The Complaint also quotes emails in which Defendants specify when and where precise numbers of fake reviews should be posted." *Id*. This long-lasting, knowing, and willful conduct has permeated Defendants' business practices. Defendants also do not tell the truth: "Although [Defendants] claim they do not pay for reviews, [they] bought over 20,000 reviews from [] Martinez alone."[10] *Id*. at ¶ 30. And they continue to be owned and operated by same two individuals. *Id*. at ¶¶ 16-18. By making false claims and supporting those claims with further falsities, including baiting the internet with tens of thousands of fake positive reviews, "Defendants have taken tens of millions of dollars from consumers who can least afford to lose their money and who need reliable housing the most." *Id*. at ¶¶ 3-5. Because of the ongoing and lucrative nature of their deception, Defendants have every incentive to continue to engage in

---

[10] To be clear, the Complaint does not allege that Defendants only purchased reviews from Martinez—it alleges that Martinez alone provided over 20,000 of Defendants' numerous fake reviews. Indeed, as alleged, Defendants "saturate the internet" with fake reviews "often" (not only) with the help of Martinez, and they "directly and through others, including Martinez" have posted mass quantities of positive reviews. Compl. ¶¶ 27, 29, 30.

7

violations of the law, and they retain the means and ability to do so.

Based on the foregoing, the FTC has clearly shown that it has reason to believe
Defendants are violating the FTC Act through ongoing conduct or, at the very least, that they are
about to violate the law given the high likelihood of recurrence.

### B.      The FTC Has the Authority to Initiate This Lawsuit

Defendants next seek dismissal by arguing that the FTC's express grant of authority to
bring suit in federal court unconstitutionally violates separation of powers principles because
FTC Commissioners are only removable for cause. This argument is foreclosed by binding
Supreme Court precedent.

The Supreme Court decided long ago that Congress could constitutionally protect FTC
Commissioners through a for-cause removal restriction. *Humphrey's Executor v. United States*,
295 U.S. 602, 632 (1935). Since then, the Supreme Court has addressed presidential removal
power multiple times, each time citing *Humphrey's Executor* and declining to overrule it,
including in *Seila Law*, the case relied upon by Defendants. *See Collins v. Yellen*, 141 S. Ct.
1761, 1786-87 & n.21 (2021); *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2192, 2198-200
(2020).[11] *Humphrey's Executor* therefore remains binding precedent that only the Supreme
Court can overrule. *In re Aiken Cnty.*, 645 F.3d 428, 446 (D.C. Cir. 2011) (Kavanaugh, J.,
concurring) ("*Humphrey's Executor* is an entrenched Supreme Court precedent, protected by
stare decisis."); *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (reaffirming that if Supreme Court
precedent has direct application, courts should follow it and leave to the Supreme Court "the

---

[11] *See also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010);
*Mistretta v. United States*, 488 U.S. 361, 410-11, 423-24 (1989); *Morrison v. Olson*, 487 U.S.
654, 686-90, 706-07 (1988); *Bowsher v. Synar*, 478 U.S. 714, 724-26 (1986). All of these cases
were decided after Congress enacted § 15 U.S.C. 53(b) in the 1970s.

prerogative of overruling its own decisions").[12]

Defendants' indirect attack on *Humphrey's Executor* is also based on the mistaken premise that the Supreme Court considered an agency without authority to enforce the law. However, the FTC has always had the authority to enforce the FTC Act, including in federal court, both before Section 13(b) was enacted and when the Supreme Court decided *Humphrey's Executor*. As originally enacted in 1914, and as it was on the books in 1935 (and still today), the FTC Act "empowered and directed" the agency to "prevent" unfair methods of competition by enforcing the FTC Act in the FTC's administrative forum and to order violators to "cease and desist" from their unlawful conduct. The FTC Act further granted the Commission power to enforce its cease-and-desist orders in federal courts of appeals and to defend those orders against challenge in the same courts. *See* FTC Act, P.L. 63-203, 38 Stat. 717, 720 (1914).[13] The fact that Congress later expanded the Commission's enforcement power does not alter the basic constitutional calculus of *Humphrey's Executor*. And *Seila Law* compels no other result. Indeed, in *Seila Law*, the Court indicated that the CFPB, to which Congress had delegated extensive enforcement power, could be rendered constitutional by becoming a multimember commission

---

[12] The Supreme Court has consistently pointed to "several organizational features" of the FTC that render its removal restrictions constitutionally permissible. *See Seila Law*, 140 S. Ct. at 2198-99. The FTC is composed of five members, no more than three of which can be from the same political party, yielding a "nonpartisan," impartial body, and Commissioners serve staggered, seven-year terms, enabling them to develop "trained judgment" and expertise. *Humphrey's Executor*, 295 U.S. at 624-25. These features, which still characterize today's FTC, effectuate Congress's goal of creating a body of experts whose decision-making is informed by their experience and knowledge of the industries they regulate. *See id.* at 625-26.

[13] Additionally, in 1933, Congress granted the FTC the authority to enforce the Securities Act, which authorized the Commission to seek preliminary and permanent injunctions against violations in federal court. *See* Public Law 73-22 Chapter 38 § 20(b), 48 Stat. 74, 86 (1933). Congress later transferred that enforcement authority to the SEC, another multimember agency that exercises substantial enforcement authority and that would have been familiar to the Court that decided *Humphrey's Executor* in 1935.

(like the FTC).[14] *Seila Law*, 140 S. Ct. at 2211.

In any event, even a successful challenge to the FTC Commissioners' removal protection would not invalidate this action or justify dismissal here. Because the FTC's Commissioners were appointed consistent with the requirements of the Appointments Clause, U.S. Const. art. II, § 2, cl. 2., even an unconstitutional removal restriction would provide "no reason" to void their actions. *Collins*, 141 S. Ct. at 1787. "Settled precedent . . . confirms that the unlawfulness of [a] removal provision does not strip the [officer] of the power to undertake the . . . responsibilities of his office." *Id.* at 1787-88 & n.23. Accordingly, Defendants' argument that the FTC's litigation authority is unconstitutional and somehow warrants dismissal must fail.

## C.    There Is Clearly a "Case or Controversy"

Defendants' contention that there is no "live case or controversy with respect to the FTC's claims" is nonsensical. The Complaint alleges that Defendants are violating the FTC Act. *See supra*, § 3.A. Defendants dispute that. *See, e.g.*, Def. Br. 8 (claiming they "ceased all conduct that the FTC alleges to be improper"). There is clearly a live case or controversy.

Defendants' supposed newfound willingness to stipulate to a permanent injunction further illustrates the case or controversy, both as to liability and the scope of injunctive relief. Defendants do not concede liability; they continue to dispute it. And the FTC cannot rely on Defendants' representations in shaping a comprehensive injunctive remedy, which will involve considering the full extent of Defendants' wrongful violations. Because Defendants have not been truthful (for example, they previously falsely denied paying for reviews), discovery is

---

[14] In *Seila Law*, the Court observed that the CFPB's structure "deviated from [that] of nearly every other independent administrative agency in our history." *Seila Law*, 140 S. Ct. at 2191. It specifically contrasted the CFPB's structure with that of the FTC, "a traditional independent agenc[y]." *Id*. at 2192, 2200.

needed to obtain further evidence of the nature and scope of Defendants' conduct to allow the Court to fashion necessary and appropriate injunctive relief. Defendants cannot moot the clear controversy by claiming they are now willing to satisfy some portion of the FTC's request for relief. *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160-65 (2016) (an unaccepted offer to satisfy a plaintiff's claim does not moot the controversy).[15]

Defendants' naked assertion that the FTC's joint action with state attorneys general is somehow improper is likewise misplaced. As set forth above, the FTC has the authority to bring this lawsuit, and nothing prevents the FTC from partnering with states whose own consumer protection statutes have also been violated by Defendants' unlawful conduct.[16] Indeed, bringing these claims, all of which undisputedly form part of the same case or controversy, in a single action promotes judicial economy and is specifically authorized by statute. 28 U.S.C. § 1367.

### D.     The Court Can and Should Exercise Supplemental Jurisdiction over the Plaintiff States' Claims

Defendants argue that if the Court dismisses the FTC's claims (Counts I and II), it should then decline supplemental jurisdiction over the Plaintiff States' claims. Defendants' argument is fatally premature and would fail even if it were timely. Defendants do not dispute that: (1) the Court is properly exercising jurisdiction over the Plaintiff States' claims at this time because they are part of the same case or controversy as the FTC's claims; and (2) the Court retains

---

[15] To the extent Defendants attempt to introduce any injunctive terms proposed pre-litigation, those proposals cannot properly be considered (*see* Fed. R. Evid. 408) and are not necessarily reflective of the injunctive relief sought now that litigation has commenced.

[16] Should the Plaintiff States obtain a monetary judgment in this case, that money will go to the Plaintiff States only—not the FTC—as was the case with the stipulated order entered by this Court against co-defendant Martinez. Doc. 31. The Southern District also recently adjudicated an action by the FTC and state partners where only the states sought monetary relief. *See FTC v. Vyera Pharms., LLC*, No. 20CV00706 (DLC), 2021 WL 4392481 (S.D.N.Y. Sept. 24, 2021).

jurisdiction over the Plaintiff States' resolved claims against co-defendant Martinez. *See* 28 U.S.C. § 1367(a) ("the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy"). Yet while the Court "may decline to exercise supplemental jurisdiction" after it "*has dismissed all claims* over which it has original jurisdiction," 28 U.S.C. § 1367(c)(3) (emphasis added), there is currently no basis for the Court to dismiss the FTC's claims, as discussed *supra*, §§ III.A-C. Because the Court continues to have original jurisdiction over the FTC's claims, the Court retains supplemental jurisdiction over Plaintiff States' claims.

Moreover, even if the FTC's claims are ultimately resolved through a stipulated injunction, the Court could and should continue exercising supplemental jurisdiction over the Plaintiff States' claims. *See Osborn v. Haley*, 549 U.S. 225, 245 (2007) ("Even if only state-law claims remained after resolution of the federal question, the District Court would have discretion, consistent with Article III, to retain jurisdiction.").

As the Second Circuit explained in *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994), "the discretion implicit in the word 'may' . . . permits the district court to weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants." Those factors weigh heavily in favor of the Court retaining supplemental jurisdiction over the Plaintiff States' claims. First, the Court already entered an order for permanent injunction and monetary and other relief against co-defendant Jonathan Martinez and thus continues to have jurisdiction over the terms of that stipulated order. Doc. 31. In addition, even if the FTC's claims are ultimately resolved through a future agreement on injunctive terms, the Court would retain jurisdiction over that injunction as well. It would thus promote efficiency for the Court to retain supplemental jurisdiction over the Plaintiff States' claims, which include

similar claims for injunctive relief and are part of the same case and controversy. Moreover, because there are six individual Plaintiff States, it would be efficient for the Court to exercise supplemental jurisdiction in this action, rather than having six separate state courts adjudicate the Plaintiff States' remaining claims—all of which are based on the same set of facts and circumstances. *See Ackerman v. Nat'l Prop. Analysts, Inc.*, 887 F. Supp. 494, 510 (S.D.N.Y. 1992) (electing to exercise supplemental jurisdiction over state law claims following dismissal of federal claims, in part because of the "numerous parties").[17] ! !

### E.      The Plaintiff States Have Properly Pled Their Deceptive Practices Claims

In arguing that the Plaintiff States do not allege a "deceptive act," Defendants misconstrue and largely ignore the allegations in the Complaint. The Complaint does not, as Defendants suggest, allege that authentic consumer reviews are likely to deceive reasonable consumers. Def. Br. 15-16. Rather, it alleges that Defendants masterminded the dissemination of thousands of "fake" and "fictitious" positive reviews in order to deceive consumers by drowning out authentic negative reviews. *See* Compl. ¶¶ 3-4; 27-41. Defendants' fake reviews are likely to deceive a reasonable consumer because they appear to be, but are not, truthful representations of actual users of the Roomster platform. *See, e.g.*, Compl. ¶¶ 39-40.

These allegations are more than sufficient to state a claim under each of the state unfair and deceptive acts and practices laws at issue[18] ("State UDAP Laws"), which generally require

---

[17] Defendants argue without any support that the Court should decline supplemental jurisdiction even if the FTC's claims survive, because the FTC is "bootstrapping" the Plaintiff States' claims in order to obtain monetary relief that it otherwise could not obtain. The Plaintiff States are separate sovereigns enforcing their own consumer protection statutes. There is no basis for the Court to decline supplemental jurisdiction because all Plaintiffs' claims are based on the same case or controversy. *See also supra*, § III.C.

[18] N.Y. Exec. Law § 63(12) (McKinney 2022); N.Y. Gen. Bus. Law §§ 349, 350 (McKinney

the Plaintiff States to allege only that the conduct in question has the capacity to deceive or is likely to deceive consumers.[19]

The Complaint more than plausibly alleges that Defendants violated each of the State UDAP Laws by knowingly purchasing fake reviews and paying to have them disseminated across the internet, for the purpose of deceiving consumers. At Roomster's direction, Martinez published over 20,000 fake reviews about Roomster's platform via thousands of fake iTunes and Gmail accounts. Compl. ¶¶ 30-31. Defendants intentionally tried to make the fake reviews look authentic, instructing that they be posted in random quantities each day "so it looks more natural." *Id.* at ¶ 38; *see also* ¶¶ 32-37. The fake reviews diluted actual reviews from real users,

---

2022); Cal. Bus. & Prof. Code §§ 17200-17210 (West 2022); Cal. Bus. & Prof. Code §§ 17500-17536 (West 2022); Colo. Rev. Stat. Ann. § 6-1-105(1) (West 2022); Fla. Stat. Ann. §§ 501.201-.210 (West 2022); 815 Ill. Comp. Stat. Ann. 505/2 (2022); Mass. Gen. Laws. Ann. ch. 93A, § 2 (West 2022).

[19] *See People ex rel. Spitzer v. Gen. Elec. Co.*, 756 N.Y.S.2d 520, 523 (N.Y. App. Div. 2003) (N.Y. Exec. Law § 63(12) fraud standard "is whether the targeted act has the capacity or tendency to deceive;" N.Y. Gen. Bus. Law § 349 deception standard is whether deceptive practice is "likely to mislead a reasonable consumer acting reasonably under the circumstances"); *Kasky v. Nike, Inc.*, 45 P.3d 243, 250 (Cal. 2002) (to state a claim under Cal. Bus. & Prof. Code, §§ 17200-17210 and 17500-17536, "it is necessary only to show that members of the public are likely to be deceived") (internal quotation marks omitted); *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 148 (Colo. 2003) (false or misleading statement violates Colo. Rev. Stat. Ann. § 6-1-105(1) when it has the "capacity or tendency to deceive, even if it did not"); *State of Fla., Off. of Att'y Gen., Dep't of Legal Affairs v. Commerce Commercial Leasing, LLC*, 946 So. 2d 1253, 1258 (Fla. Dist. Ct. App. 2007) (an Attorney General's FDUTPA complaint need only allege that defendants "engaged in unconscionable, unfair or deceptive acts or practices likely to deceive a consumer acting reasonably under the circumstances"); *People ex rel. Hartigan v. Knecht Servs., Inc.*, 575 N.E.2d 1378, 1387 (Ill. App. Ct. 1991) (advertisement is deceptive under 815 Ill. Comp. Stat. Ann. 505/2 "if it creates the likelihood of deception or has the capacity to deceive"); 940 Mass. Code Regs. 3.05(1) (act or practice is deceptive under Mass. Gen. Law ch. 93A if it "has the capacity or tendency or effect of deceiving" consumers); *Aspinall v. Phillip Morris Cos.*, 813 N.E.2d 476, 488 (Mass. 2004) ("advertisement is deceptive when it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted.").

who had tried to warn fellow consumers that the Roomster platform was "[f]ull of scammers" and a "waste of money." *Id.* at ¶ 41. Not only have the Plaintiff States alleged that the very purpose of Defendants' fake reviews was to deceive consumers—a textbook violation of State UDAP Laws—they have exceeded the relevant pleading standards by alleging that consumers actually *were* deceived and have suffered real injury as a result. *Id.* at ¶¶ 42, 44.

Defendants' only response to these straightforward allegations is a non-sequitur: that it is unreasonable for consumers to rely on "*subjective user-supplied* reviews," because those reviews are "mere opinion." Def. Br. 16 (emphasis in original). Not only is the premise of that argument incorrect—the very purpose of app store reviews is to help consumers make informed purchase decisions[20]—it is also irrelevant here, where the Defendants purchased "fake," "fictitious" reviews that do not reflect any user's opinion and were not posted by real consumer users at all. *See, e.g.*, Compl. ¶¶ 27, 36. Defendants took pains to ensure their fake reviews would deceive reasonable consumers into thinking they were real reviews from real people, in order to con those consumers into spending money on a predatory platform. *Id.* at ¶¶ 32-33, 36, 38. As the Ninth Circuit recently observed, "when someone falsely claims to be independent, rigs the ratings in exchange for compensation, and then profits from that perceived objectivity, that speaker has drowned the public trust for economic gain." *NutriSearch*, 985 F.3d. at 1118-19; *accord Interlink Prod. Int'l, Inc. v. F & W Trading LLC*, No. CV151340MASDEA, 2016 WL 1260713, at *9 (D.N.J. Mar. 31, 2016) (false advertising claim sufficiently pled by allegation that defendant "purposefully dr[o]ve up Amazon product ratings . . . intending for consumers to rely

---

[20] Compl. ¶ 28; *see also Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1118 (9th Cir. 2021) ("To navigate the seemingly unending stream of advertisements, consumers often depend on independent reviews for candid and accurate assessments.").

on the misleading heightened reviews when selecting a product for purchase").

The State UDAP Law claims arise not only out of Defendants' fake-review scheme, but also out of Defendants deceptively and falsely advertising rental listings as "verified," "authentic," and "available." Compl. ¶¶ 3-4. Defendants' Motion raises no argument whatsoever regarding the sufficiency of those allegations, nor could it, because false statements are inherently actionable under State UDAP Laws prohibiting false advertising. *See supra*, n. 18. The Plaintiff States' verified-listing allegations are independently sufficient to support their State UDAP claims, and Defendants do not claim otherwise.

### F.   Defendants' Constitutional Challenge to the Potential Scope of a State Law Restitution Remedy Is Procedurally Premature and Substantively Meritless

In Complaint Counts III and IV, New York alleges that Defendants engaged in fraudulent and illegal conduct under N.Y. Executive Law § 63(12), deceptive acts and practices under N.Y. General Business Law § 349 and false advertising under § 350. New York law authorizes broad relief for such claims, including injunctions, restitution, damages, and disgorgement. *New York v. Greenberg*, 27 N.Y.3d 490, 495-98 (N.Y. 2016). Defendants ignore these sufficiently pled claims and instead argue about a remedy, claiming that, "to the extent" New York seeks restitution "for conduct occurring wholly outside of the State of New York," granting such a request would violate the dormant Commerce Clause. Def. Br. 17-20. This argument fails on multiple levels.

To begin, the argument is premature on a motion to dismiss. Plaintiffs need only plausibly allege that Defendants are "liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). There is no pleading requirement that Plaintiffs demonstrate that they are entitled to each form of *relief* sought. *See, e.g.*, *Norwalk CORE v. Norwalk Redev. Agency*, 395

F.2d 920, 925-26 (2d Cir. 1968) ("[A] complaint should not be dismissed for legal insufficiency except where there is a failure to state a claim on which some relief, not limited by the request in the complaint, can be granted."). Indeed, the Rule 8(a)(3) demand for relief is separate from the Rule 8(a)(2) claim, *see Pavers & Rd. Builders Dist. Council Welfare Fund v. J. Pizzirusso Landscaping Corp.*, No. 14-CV-04186 (MDG), 2018 WL 2186481, at *3 (E.D.N.Y. May 11, 2018), and under Rule 54(c), a judgment must grant a party all relief to which the party is entitled, "even if . . . not demanded . . . in its pleadings." Accordingly, Defendants' challenge to the potential scope of a restitution remedy provides no basis for dismissal. *See Burkina Wear, Inc. v. Campagnolo, S.R.L.*, No. 07-cv-3610, 2008 WL 1007634, at *3 (S.D.N.Y. Apr. 9, 2008) (denying 12(b)(6) motion: "the availability of the specific relief requested pursuant to any given count of the Complaint is not relevant to the question of whether [plaintiff] has stated a claim.").

In any event, Defendants' argument also fails because the dormant Commerce Clause has no application here. In assessing an argument that a state law has an unconstitutional extraterritorial effect, the Second Circuit "focus[es] squarely" on whether the law "has the practical effect of requiring out-of-state commerce to be conducted at the regulating state's direction," and also considers "what effect would arise if not one, but many or every State adopted similar legislation." *VIZIO, Inc. v. Klee*, 886 F.3d 249, 255 (2d Cir. 2018). The Supreme Court, however, "has used its extraterritoriality principle to strike down state laws only three times." *Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1172 (10th Cir. 2015). In each case, the statutes "control[ed] in-state and out-of-state pricing of goods going into the state . . . by making specific reference to the terms of such pricing . . . and attaching in-state consequences

where the pricing terms violated the statutes."[21] *Freedom Holdings Inc. v. Spitzer*, 357 F.3d 205,

221 (2d Cir. 2004). Thus, the Supreme Court's precedents on extraterritoriality "concern[] only

price control or price affirmation statutes that involve 'tying the price of . . . in-state products to

out-of-state prices.'" *Energy & Env't Legal Inst*, 793 F.3d at 1174 (quoting *Pharm. Rsch. &

Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003)); *accord VIZIO*, 886 F.3d at 257 (rejecting a

dormant Commerce Clause challenge where the state statute did "not mak[e] specific reference

to the terms of . . . pricing" and did not "attach in-state consequences where the pricing terms

violate the statute.") (internal quotation marks omitted).

By contrast, the Second Circuit has recognized that, "because consumer protection is a

field traditionally subject to state regulation, [w]e should be particularly hesitant to interfere with

the [State's] efforts under the guise of the Commerce Clause." *SPGGC, LLC v. Blumenthal*, 505

F.3d 183, 194 (2d Cir. 2007) (internal quotation marks omitted). N.Y. Executive Law § 63(12),

and N.Y. GBL §§ 349 and 350 are unquestionably consumer protection statutes, and Defendants

fail to identify any recognized basis under which these statutes could be found to violate the

extraterritoriality principle. None "mak[e] specific reference to the terms of . . . pricing" or

"attach[] in-state consequences where the pricing terms violate[] the statute[]." *Freedom*

---

[21] *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 173 (2d Cir. 2005), cited by
Defendants, is consistent with this construction, as there an extraterritoriality challenge survived
only because the alleged "practical effect of the challenged statutes" was to "short-circuit[]
normal pricing decisions" by "effectively 'regulat[ing] the pricing mechanism for goods' in
interstate commerce." *Id.* (quoting *Healy v. Beer Institute, Inc.*, 491 U.S. 324, 340 (1989)).
Defendants cite just two other district court cases sustaining extraterritoriality claims, one of
which the Second Circuit vacated, *Eric M. Berman v. City of N.Y.*, 895 F. Supp. 2d 453
(E.D.N.Y. 2012), *vacated and remanded on other grounds*, 796 F.3d 171, and both of which
involved factually inapposite extraterritorial licensing requirements. *See id.* (debt collection
licensing); *see also City Carting, Inc. v. New York City Bus. Integrity Comm'n*, No. 14 CIV.
8582 PAC, 2014 WL 6604053 (S.D.N.Y. Nov. 13, 2014) (garbage collection licensing).

*Holdings*, 357 F.3d at 221 (summarizing extraterritoriality cases). Nor do Defendants explain

how allowing restitution for out-of-state victims "control[s] in-state and out-of-state pricing of

goods going into the state," or otherwise "control[s] the terms of out-of-state transactions." *Id*.

 Defendants' extraterritoriality theory also fails because there is no basis upon which to

conclude that New York is seeking to regulate "conduct occurring wholly outside" its borders.

Def. Br. 17. To the contrary, it seeks to remedy wrongful conduct that took place in the State of

New York. The Complaint alleges that the residence of the Defendants and thus the source of the

misconduct was in New York. ¶¶ 16-18. As one remedy, Plaintiffs request nationwide restitution

"*as provided under state law*." Prayer for Relief at B (emphasis added). Settled New York law

authorizes the Attorney General to recover restitution for both in-state *and* out-of-state

consumers harmed by conduct that occurs in New York. *See, e.g., People v. H & R Block Inc.*, 58

A.D.3d 415, 417 (N.Y. App. Div. 2009) ("reject[ing] defendants' argument that the Attorney

General has no authority to recover on behalf of non-New York residents"); *People v.*

*Telehublink*, 301 A.D.2d 1006, 1009 (N.Y. App. Div. 2003) (holding that the relevant statutes

"do not limit [the Attorney General's] authority to seek relief on behalf of parties injured by

conduct in New York merely because those parties are nonresidents"). These cases recognize

"New York's vital interest in securing an honest marketplace in which to transact business [is]

threatened when defendants use[] a New York business to complete the deceptive transactions at

issue." *H & R Block*, 58 A.D.3d at 417. Whatever the breadth of the extraterritoriality principle,

it certainly provides no barrier to statues regulating this sort of in-state business activity by an in-

state business—even if the deception reached victims beyond state lines. *See Freedom Holdings*,

357 F.3d at 221 ("The mere fact that state action may have repercussions beyond state lines is of

no judicial significance so long as the action is not within that domain which the Constitution

forbids.") (quoting *Osborn v. Ozlin*, 310 U.S. 53, 62 (1940)).

Unable to cite supporting precedent, Defendants are left to speculate that permitting New York to recover restitution for non-residents "create[s] a risk of double-recovery between the states." Def. Br. 19. Yet Plaintiffs do not seek duplicative recoveries, only restitution sufficient to compensate injured consumers. Tellingly, Defendants fail to identify a single example of double-recovery, even though New York courts have allowed restitution to non-residents for decades. *E.g.*, *State by Abrams v. Camera Warehouse, Inc.*, 130 Misc. 2d 498, 499 (N.Y. Sup. Ct. 1985). This failure is unsurprising. Any restitution "would be awarded by a court sitting in equity. The defendants would have an opportunity to be heard and to alert a court to the problem of duplicative recoveries." *FTC v. Vyera Pharms.*, *LLC*, No. 20CV00706 (DLC), 2021 WL 4392481, at *5 (S.D.N.Y. Sept. 24, 2021) (rejecting same duplicative recovery concern as "not an impediment to the plaintiff States pursuing . . . their request for nationwide relief"). Thus, "little danger of 'inconsistent legislation' exists." *Freedom Holdings*, 357 F.3d at 220 n.13.

### G.   Counts III and IV Regarding Defendants' Fraudulent and Illegal Conduct under New York Law Are Sufficiently Pled

Defendants next attempt to repackage their defective dormant Commerce Clause theory as a statutory requirement. They argue that, to state a claim under N.Y. Executive Law § 63(12), and N.Y. GBL §§ 349 and 350, New York must allege "the details or location(s) of the allegedly deceived consumers or the related underlying transactions" sufficient to show that consumers were deceived in the State of New York. Def. Br. 20-22. This theory fares no better than the last.

As an initial matter, Defendants misleadingly group the relevant New York statutes in arguing that the "plain terms" of "the NY Consumer Protection Statutes" are "territorially limited" to consumers deceived in state. Def. Br. 20. Defendants' authority concerns almost

20

exclusively claims under §§ 349 and 350,[22] ignoring that New York asserts a distinct claim for repeated and persistent fraudulent conduct in violation of § 63(12). *See* Compl. ¶ 53; *see also Matter of People by Schneiderman v. Trump Entrepreneur Initiative LLC*, 137 A.D.3d 409, 418 (N.Y. App. Div. 2016) (§ 63(12) authorizes a standalone claim for fraud). The text of § 63(12) "imposes no geographical restrictions upon the consumer complaints which properly serve as a basis for an enforcement action by the Attorney General." *People v. Lipsitz*, 174 Misc. 2d 571, 580 (N.Y. Sup. Ct. 1997). Courts consistently reject the argument—like Defendants' here—that § 63(12) claims against in-state businesses are territorially limited to consumers who were deceived in state. *Id.*; *see also Vyera Pharms.*, 2021 WL 4392481, at *4 ("When a defendant engages in conduct within the State prohibited by [§ 63(12)], the Attorney General is authorized to seek relief on behalf of out-of-state residents injured by the wrongdoing.").

Although N.Y. GBL §§ 349 and 350, by contrast, reference deceptive acts or false advertising conduct "in this state," Defendants misstate this provision's application. Defendants rely on *Goshen v. Mut. Life Ins. Co.*, 774 N.E.2d 1190 (N.Y. 2002) and its progeny to argue that "the deception of a consumer must occur in New York" for §§ 349 and 350 to apply. Def. Br. 20. They ignore, however, the Second Circuit's holding that under "*Goshen* and the cases construing it . . . a deceptive *transaction* in New York falls within the territorial reach of" those statutes, regardless of the consumer's residence or the place of the deception. *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 123 (2d Cir. 2013) (emphasis added). Defendants also ignore that *Goshen* and the other cases on which Defendants rely addressed the *private* right of action under

---

[22] The sole exception is Defendants' citation to *CFPB v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 784 (S.D.N.Y. 2018), which *sustained* claims under § 63(12), and which did not address the location of the deceived customers or transactions.

§ 349(h), which has different elements than an *Attorney General* action under § 349(b). *See Goshen*, 774 N.E.2d at 1195 ("[U]nlike private plaintiffs," the Attorney General may secure equitable relief under § 349 "without a showing of injury."). Indeed, Defendants do not cite a single case in which a § 349(b) action was dismissed on the pleadings for failure to allege an adequate in-state nexus.[23]  This is because courts have consistently limited *Goshen*'s application in § 349(b) Attorney General actions and have allowed such claims to proceed so long as "at least some part" of the deception took place in New York. *People v. Nat'l Home Protection, Inc.*, 2009 N.Y. Misc. LEXIS 3667, at *8-*9 (N.Y. Sup. Ct. Dec. 8, 2009); *see also Telehublink*, 301 A.D.2d at 1009-10 (out-of-state corporation used a New York address for mail relating to fraudulent sales activity).

New York's claims easily clear that threshold here. The Complaint alleges that Roomster transacts business and has its principal place of business in New York; that Roomster's owners and co-founders, who also serve as Roomster's Chief Executive Officer and Chief Technology Officer, reside in this District and transact business here; and that these New York-based Defendants "inundated the internet with tens of thousands of fake positive reviews" and with "fake listings" on other sites, many of which were undoubtedly received by New York consumers. ¶¶ 3, 16-18, 27. Indeed, to the extent the Court honors Defendants' request to take judicial notice of Roomster's website or Terms of Use, *see* Def. Br. 3, information therein further connects transactions to New York. For example, Roomster's homepage lists New York City as one of Roomster's "popular cities" and invites consumers to view hundreds of New York

---

[23] *People v. Direct Revenue, LLC*, 862 N.Y.S.2d 816, 816 (N.Y. Sup. Ct. 2008), cited by Defendants, is legally inapposite because it involved a special proceeding decided "in accordance with the standards for granting summary judgment," and factually inapposite because in that case there was no evidence presented that connected the transactions to New York.

listings.[24] In addition, Roomster's Terms of Use from as recently as June 22, 2022 provide that New York courts are the exclusive venue for litigation with consumers, require that consumers consent to jurisdiction in New York, and list a New York address for consumer inquiries.[25]

### H.    Section 230 of the CDA Is Inapplicable

Finally, Section 230 of the Communications Decency Act ("CDA"), 47 USC § 230, which provides limited legal protections to some parties operating online, has no application to Plaintiffs' claims. Specifically, § 230(c)(1), which prohibits treating an interactive computer service as a publisher or speaker of any information provided by a third party, "applies only if the interactive service provider is not also an 'information content provider' of the content which gives rise to the underlying claim." *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 174, 176 (2d Cir. 2016) (finding defendant not entitled to § 230 immunity "because it is an information content provider with respect to the deception at issue and because [it] is liable under the FTC Act for its own deceptive acts or practices . . . by directly participating in the deceptive scheme"); *see also Henderson v. Source For Pub. Data*, No. 21-1678, 2022 U.S. App. LEXIS 30534, *n. 22 (4th Cir. Nov. 3, 2022) ("when a provider of an interactive computer service also provides the information at issue in a claim, it receives no protection under § 230(c)(1)"). An "information content provider" includes "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *LeadClick*, 838 F.3d at 174 (citing 47 U.S.C. § 230(f)(3)). An interactive computer service is responsible for the development of the information at issue in the

---

[24] *Homepage*, Roomster, https://www.roomster.com (last visited Dec. 2, 2022).
[25] *See Roomster Corp. Terms of Use*, Roomster
https://web.archive.org/web/20220622152912/https://www.roomster.com/Terms (as it existed June 22, 2022).

case if they "'directly and materially' contributed to what made the content itself 'unlawful.'"
*Force v. Facebook*, 934 F.3d 53, 68 (2d Cir. 2019) (quoting *LeadClick*, 838 F.3d at 174).

The CDA thus does not immunize Defendants for their own misrepresentations, whether
on the Roomster platform or elsewhere. As Plaintiffs allege, Defendants themselves created the
content at issue on their platform: they advertised that the listings on Roomster were verified and
authentic when they were not. And Plaintiffs' Complaint clearly alleges that Defendants are
responsible for the statements that form the basis of Plaintiffs' deception claims: "*Defendants
claim* that the listings provided on their platform are real, available, and verified; "*on their
website, [Defendants] state* that Roomster has 'authentic' listings" and that they "mak[e] sure the
Roomster profiles and the listings on the site are complete, accurate, updated and yes . . .
authentic." Compl. ¶¶ 22-24 (emphasis added). These are Defendants' own statements—content
they themselves created. But as detailed in the Complaint, Defendants' statements are not true. In
reality, Defendants do not verify listings or ensure that their listings are real or authentic—they
post listings immediately upon request, as long as the street address associated with the listing is
recognized by the platform. *Id.* at ¶ 25. Here, as in *LeadClick*, the CDA does not immunize
Defendants from liability for their own content. 838 F.3d at 174, 176.

Similarly, the CDA does not apply to Defendants' fake reviews, again because
Defendants themselves are responsible for the creation of the deceptive content,[26] and because
the reviews appeared on other platforms, such as Apple and Google. As alleged in the
Complaint, Defendants saturate the internet with tens of thousands of fake positive reviews in

---

[26] Defendants' assertions that they "believe[]" their paid reviews are "authentic" are impertinent
to a motion to dismiss and are contradicted by Defendants' own email directives set forth in the
Complaint, including posting "random" amounts of reviews each day to look "natural." ¶¶ 32-38.

violation of the law and app store terms of service, with specific instructions to "spread out the reviews to be 'constant and random'" "in order to appear natural." Compl. ¶¶ 27, 29, 33-38. The "sheer volume" of Defendants' "fabricated" reviews "dilutes reviews from real users." ¶ 39-41. The CDA does not immunize Defendants from liability for their own unlawful conduct.

In addition, insofar as Plaintiffs' deception claims capture fake listings that direct consumers to the Roomster platform, the CDA likewise does not apply, both because Defendants are responsible for the unlawful content and because those fake listings appear on third-party platforms such as Craigslist. *Id.* at ¶ 42 ("To further induce consumers to pay for their Roomster platform, [Defendants] bait the internet with advertisements for fake listings, including on Craigslist . . . consumers are directed to Defendants' platform and encouraged to sign up and pay a fee to obtain information necessary to secure the rental [only to] learn that the listings that drove them to [Defendants'] platform do not exist.").

Section 230 "is not a license to do whatever one wants online . . . it does not insulate a company from liability for all conduct that happens to be transmitted through the internet. Instead, protection under § 230(c)(1) extends only to bar certain claims, in specific circumstances, against particular types of parties." *Henderson*, 2022 U.S. App. LEXIS 30534, *29. None of those circumstances are present here. In short, Plaintiffs' claims do not attempt to hold Defendants liable as publishers of third-party content on their platform and instead relate to Defendants' own conduct, including Defendants' own content on their platform and to fake content developed by and at the direction of Defendants and placed on other platforms.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

Dated: December 5, 2022               Respectfully submitted,

_____
ANGELEQUE P. LINVILLE (*admitted pro hac vice*)
alinville@ftc.gov; (404) 656-1354
VALERIE M. VERDUCE (*admitted pro hac vice*)
vverduce@ftc.gov; (404) 656-1355
Federal Trade Commission
233 Peachtree Street, Suite 1000
Atlanta, GA 30303
Facsimile: (404) 656-1379

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

*I certify pursuant to Rule 8.5(b) of the Electronic Case Filing Rules and Instructions that each of the other signatories to this memorandum of law has agreed to the form and substance and that I have their consent to submit this memorandum electronically.*

ROB BONTA
Attorney General, State of California

NICKLAS A. AKERS
Senior Assistant Attorney General

*/s/ Emily Kalanithi*

EMILY KALANITHI (NY 4191805)
Supervising Deputy Attorney General
emily.kalanithi@doj.ca.gov; (415) 510-3468
JON F. WORM (*admitted pro hac vice*)
Supervising Deputy Attorney General
jon.worm@doj.ca.gov; (619) 738-9325
ADELINA ACUÑA (*admitted pro hac vice*)
Deputy Attorney General
adelina.acuna@doj.ca.gov; (415) 510-3752
TIMOTHY E. SULLIVAN (*admitted pro hac vice*)
Deputy Attorney General
timothy.sullivan@doj.ca.gov; (510) 879-0987
CAROLINE E. WILSON (*admitted pro hac vice*)
Deputy Attorney General
callie.wilson@doj.ca.gov; (415) 229-0106

California Department of Justice
Office of the Attorney General
455 Golden Gate Ave., 11th Fl.
San Francisco, CA 94102

Attorneys for Plaintiff
PEOPLE OF THE STATE OF CALIFORNIA

PHILIP J. WEISER

Attorney General
State of Colorado


*/s/ Brady J. Grassmeyer*
_____
ABIGAIL M. HINCHCLIFF (*admitted pro hac vice*)
First Assistant Attorney General
Abigail.Hinchcliff@coag.gov; (720) 508-6000
BRADY J. GRASSMEYER (*admitted pro hac vice*)
Assistant Attorney General
Brady.Grassmeyer@coag.gov; (720) 508-6000
1300 Broadway, 10th Floor
Denver, CO 80203

Attorneys for Plaintiff
STATE OF COLORADO



ASHLEY MOODY
Attorney General, State of Florida

*/s/ Ryann H. Flack*
_____
Ryann H. Flack (*admitted pro hac vice*)
Ryann.Flack@myfloridalegal.com; (786) 792-6249
Miles Vaughn (*admitted pro hac vice*)
Miles.Vaugh@myfloridalegal.com; (813) 287-7257
Office of the Attorney General
Consumer Protection Division
SunTrust International Center
1 S.E. 3rd Avenue, Suite 900
Miami, FL 33131

Attorneys for Plaintiff
STATE OF FLORIDA

28

KWAME RAOUL
Attorney General of Illinois


*/s/ Elizabeth Blackston*

CASSANDRA HALM (*admitted pro hac vice*)
Assistant Attorney General
Cassandra.Halm@ilag.gov; (217) 725-9591

ELIZABETH BLACKSTON (*admitted pro hac vice*)
Bureau Chief
Elizabeth.Blackston@ilag.gov; (217) 725-8649

Office of the Illinois Attorney General
500 South Second Street
Springfield, IL 62701

Attorneys for Plaintiff
THE PEOPLE OF THE STATE OF ILLINOIS



MAURA HEALEY
Attorney General
Commonwealth of Massachusetts

*/s/ Mychii Snape*

Mychii Snape (MS1544)
Assistant Attorney General
Mychii.Snape@mass.gov; (617) 727-2200
Consumer Protection Division
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108

Attorney for Plaintiff
COMMONWEALTH OF MASSACHUSETTS

29

LETITIA JAMES
Attorney General of the State of New York

*/s/ Christian Reigstad*

_____

MELVIN L. GOLDBERG
Assistant Attorney General
Melvin.Goldberg@ag.ny.gov; (212) 416-8296
Christian Reigstad
Assistant Attorney General
Christian.Reigstad@ag.ny.gov; (212) 416-8321
28 Liberty Street
New York, New York 10005
Facsimile: 212-416-6003

Attorneys for Plaintiff
PEOPLE OF THE STATE OF NEW YORK

and

JANE M. AZIA
Bureau Chief
Consumer Frauds and Protection Bureau

LAURA J. LEVINE
Deputy Bureau Chief
Bureau of Consumer Frauds and Protection

Of Counsel for Plaintiff
PEOPLE OF THE STATE OF NEW YORK