UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————————————x

FEDERAL TRADE COMMISSION, PEOPLE OF
THE STATE OF CALIFORNIA, STATE OF
COLORADO, STATE OF FLORIDA, PEOPLE
OF THE STATE OF ILLINOIS,
COMMONWEALTH OF MASSACHUSETTS,
AND PEOPLE OF THE STATE OF NEW YORK,

Plaintiffs,
        -against-

ROOMSTER CORP., JOHN SHRIBER,
ROMAN ZAKS, AND JONATHAN
MARTINEZ,

Defendants.
——————————————————————————x



No. 22 Civ. 7389 (CM)

### DECISION AND ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS, TO STAY DISCOVERY, AND TO ENTER A PROTECTIVE ORDER[1]

McMahon, J.:

This action is brought by Plaintiffs, the Federal Trade Commission ("FTC") and the

States of California, Colorado, Florida, Illinois, the Commonwealth of Massachusetts, and the

State of New York ("Plaintiff States," and together with the FTC, "Plaintiffs"), against Roomster

Corporation, John Shriber, individually and as an officer of Roomster, and Roman Zaks,

individually and as an officer of Roomster (collectively, "Defendants").[2] Defendants operate an

---

[1] The defendants requested oral argument on this motion, but per my individual practices, I have decided that oral argument is unnecessary in this case. We will discuss the discovery issues at the initial conference on February 2.

[2] Jonathan Martinez, individually and doing business as AppWinn, is named in the complaint. However, upon the date of filing the complaint, Plaintiffs and Martinez agreed to a stipulation, Dkt. No. 2, which the court approved on September 6, 2022. (Dkt. No. 31). As a result, Martinez was dismissed as a Defendant.

internet-based room and roommate finder platform called "Roomster." Plaintiffs allege that Defendants have falsely represented that properties listed on the Roomster platform are real, available, and verified. They further allege that Defendants have created or purchased thousands of fake positive reviews to support these representations and placed fake rental listings on the Internet to drive traffic to their platform. Plaintiff FTC alleges that Defendants' acts or practices violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). Plaintiff States allege that Defendants' acts or practices violate the unfair and deceptive acts and practices laws of their respective states.

Defendants move for dismissal of Plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants have also moved for a stay of discovery pending disposition of their motion to dismiss, and for the entry of a protective order relating to discovery.

For the reasons set forth below, Defendants' motions to dismiss and for a protective order are DENIED. Defendants' motion to stay discovery is DENIED as moot.

## I.    Background

### A.    The Defendants

Defendant Roomster Corp. ("Roomster") is a New York corporation with its principal place of business at 285 W Broadway, Suite 410, New York, New York 10013. (Compl. ¶ 16, Dkt. No. 4). Roomster is a small company that is co-owned by Defendants John Shriber and Roman Zaks. (*Id.*)

Defendant John Shriber ("Shriber") is the co-founder, co-owner, and Chief Executive Officer of Roomster. (*Id.* ¶ 17). Shriber exercises control over all aspects of Roomster's business operations and is responsible for approving Roomster-supplied platform content. (*Id.*).

Defendant Roman Zaks ("Zaks") is the Chief Technology Officer, and along with Defendant Shriber, the co-founder and co-owner of Roomster. (*Id.* ¶ 18). Zaks also exercises

2

control over all aspects of Roomster's business operations and is likewise responsible for approving Roomster-supplied platform content. (*Id.*).

### B.    Allegedly Fake Rental Listings, Reviews, and Craigslist Postings

Defendants' Roomster platform purports to be an intermediary between individuals who are seeking rentals, sublets, and roommates. (*Id.* ¶¶ 6, 21). Defendants advertise that their platform, available through their website and corresponding mobile applications, allows users to post and search listings for living arrangements, including rental properties, room rentals, sublets, and roommate requests. (*Id.* ¶ 21).

However, Plaintiffs claim that users are more likely to get scammed on Defendants' platform than to get an apartment. They explain that many of the listings on the Defendants' platform are fake, and the platform is rife with fraudsters who have taken hundreds and thousands of dollars from its often-low-income users. (*Id.* ¶¶ 42–44). In spite of this widespread fraud, they aver that Defendants did not and do not effectively verify listings or ensure that their listings are real or authentic. (*Id.* ¶ 25). Instead, the Defendants post listings on their Roomster platform immediately upon request, as long as the street address associated with the listing is recognized by the platform. (*Id.*). For example, during an undercover investigation, Defendants immediately accepted and published a fake listing where the address was a U.S. Postal Office commercial facility, not an apartment. (*Id.* ¶ 26). That listing has remained active for several months. (*Id.*).

Despite this failure to police fraud on their platform, Plaintiffs allege that Defendants claim that the listings provided on their platform are real, available—and are verified as such. (*Id.* ¶ 22). In numerous instances and on various locations on their website, the Roomster Defendants state that Roomster has "authentic" listings and that the Roomster Defendants

"mak[e] sure the Roomster profiles and the listings on the site are complete, accurate, updated and yes…authentic." (*Id.* ¶ 23). Until they received notice of this investigation, the Roomster Defendants claimed on their mobile device applications to have "millions of verified listings" in a "safe community with real members worldwide." (*Id.* ¶ 24).

Plaintiffs also allege that Defendants have paid and continue to pay for thousands of fake reviews of the Roomster platform to entice individuals to use the platform and sign up for paid membership. (*Id.* ¶¶ 27–30). Defendants, directly and through others (including dismissed defendant Jonathan Martinez), have posted mass quantities of positive four and five star fake reviews. (*Id.* ¶¶ 27, 29). Although the Defendants claim they do not pay for reviews, Plaintiffs allege that Defendants purchased over 20,000 reviews from Martinez alone. (*Id.* ¶ 30).

Defendants engaged Martinez to submit fabricated reviews of the Roomster application to mobile phone application stores ("app stores") through "drip campaigns," which involve the steady submission of random numbers of fake reviews at random times to evade the stores' processes for detecting fake or fraudulent reviews. (*Id.* ¶ 31, 32–39). Plaintiffs argue that, by purchasing fake reviews, Defendants are distorting the market for this type of service, deceiving potential users about the significant proportion of fake listings, and obscuring real, negative reviews about the widespread fraudulent listings on the platform. (*Id.* ¶¶ 27, 31, 41).

Plaintiffs further allege that the Roomster Defendants, either directly or through their affiliates, placed advertisements for fake listings on various websites, including on Craigslist. (*Id.* ¶ 42). Through these fake listings, consumers are directed to Defendants' platform and encouraged to sign up and pay a fee to obtain information necessary to secure the rental—only to discover that the listing does not exist. (*Id.*).

As a result, the FTC alleges that the Roomster Defendants are violating or are about to violate the FTC Act, because, among other things, they have engaged in unlawful acts and practices repeatedly over a period of at least four years, have done so willfully and knowingly, and continued their unlawful acts or practices despite knowledge of numerous complaints and the FTC investigation. (*Id.* ¶ 45).

### C.    The Present Litigation

On August 30, 2022, Plaintiffs filed the Complaint in this action. Plaintiff FTC alleges two counts of violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). Plaintiff FTC alleges Defendants engaged in a deceptive act or practice and the making of false advertisements by (1) representing, directly or indirectly, expressly or by implication, that certain reviews of the Roomster platform were truthful reviews by actual users of the Platform. Plaintiff FTC further alleges that Defendants engaged in a deceptive act or practice by (2) representing, directly or indirectly, expressly or by implication, or through affiliates acting on their behalf and for their benefit, that the listings on their Roomster platform are verified, authentic, or available.

Plaintiff States assert various counts of their respective state unfair and deceptive acts and practices laws ("State UDAP Laws").[3]

On the same day, Plaintiffs also filed a stipulation for a permanent injunction, monetary judgment, and other relief with former defendant Jonathan Martinez, (Dkt. No. 2), which the court approved on September 6, 2022. (Dkt. No. 31). In the stipulation, Martinez did not admit or

---

[3] N.Y. Exec. Law § 63(12) (McKinney 2022); N.Y. Gen. Bus. Law §§ 349, 350 (McKinney 2022); Cal. Bus. & Prof. Code §§ 17200–17210 (West 2022); Cal. Bus. & Prof. Code §§ 17500–17536 (West 2022); Colo. Rev. Stat. Ann. § 6-1-105(1) (West 2022); Fla. Stat. Ann. §§ 501.201–.210 (West 2022); 815 Ill. Comp. Stat. Ann. 505/2 (2022); Mass. Gen. Laws. Ann. ch. 93A, § 2 (West 2022).

deny any allegation of the complaint, but he agreed to be permanently enjoined from selling

consumer endorsements, misrepresenting that consumer reviews or endorsements are truthful or

made by an actual user of a product or service, or making a misrepresentation through the use of

a consumer review or endorsement of a product or service. (Stipulation 3–4; Dkt. No. 31).  He

further agreed to notify Apple, Inc. and Google LLC that Roomster had paid him for reviews to

be posted to their platforms and to a monetary judgment. (*Id.* at 4). As a part of his settlement

agreement, Martinez has agreed to cooperate with the Plaintiffs in this case.  (*Id.* at 7).

Plaintiff FTC demands a permanent injunction to prevent future violations of the FTC

Act and the Plaintiff States' laws.[4] Plaintiff States join the FTC in its demand for a permanent

injunction and additionally seek civil penalties for each violation of their respective state laws, as

well as attorneys' fees and costs.

On October 31, 2022, Defendants moved to dismiss Plaintiffs' complaint for failure to

state a claim. (Dkt. No. 43). Subsequently, on January 6, 2023, Defendants moved for a stay of

discover pending disposition of their motion to dismiss and the entry of a protective order

governing the exchange of confidential information during discovery. (Dkt. No. 59).

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a complaint

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v.

Twombly*, 550 U.S. 544, 570 (2007)). "[A]ll reasonable inferences should be drawn in favor of

the plaintiff," but the "complaint must contain sufficient allegations to nudge a claim 'across the

---

[4] Plaintiffs' complaint suggests that the FTC also seeks monetary relief. However, the FTC
concedes that it is not seeking monetary relief. *See infra* Part II.

line from conceivable to plausible.'" *Sphere Digital, LLC v. Armstrong*, No. 20-cv-4313 (CM),
2020 WL 6064156, at *4 (S.D.N.Y. Oct. 14, 2020) (quoting *Twombly*, 550 U.S. at 555). Where a
plaintiff fails to "nudge[] their claims across the line from conceivable to plausible, their
complaint must be dismissed." *Twombly*, 550 U.S. at 570. Rule 12(b)(6) "does not impose a
probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable
expectation that discovery will reveal evidence of" the truth of the allegations. *Id.* at 545.

## DISCUSSION

Defendants argue that the complaint should be dismissed because: (1) the FTC has not
sufficiently plead Defendants are violating or are about to violate Section 5(a) of the FTC Act;
(2) the FTC lacks standing to bring its action because Defendants have ceased all allegedly
improper conduct; and (3) to the extent any allegedly improper conduct continues, the
Defendants are willing to stipulate to the injunctive relief sought by the FTC. In the alternative,
the Defendants claim that (4) the FTC lacks constitutional authority to initiate this suit. If the
Court chooses to dismiss the FTC's claim, the Defendants ask the court (5) to decline to exercise
supplemental jurisdiction over the remaining state law claims.

If the court chooses to exercise supplemental jurisdiction over the state claims,
Defendants argue that the state claims should be dismissed because (6) the allegedly fraudulent
user-provided reviews do not qualify as deceptive acts under the applicable state laws; (7) New
York fails to state a claim under New York General Business Laws ("NYGBL") §§ 349, 350 and
the New York Executive Law ("NYEL") § 63(12) because the Complaint is devoid of allegations
that any deception occurred in the state; and (8) any future order that would provide for
"nationwide restitution" on the basis of New York state law would violate the dormant
Commerce Clause.

Finally, Defendants argue that, even if Plaintiffs may bring their claims, Defendants cannot be held liable for injuries stemming from user-generated listings and reviews because (9) they are an interactive computer service provider and so are immune from liability for inaccuracies in user-supplied content, pursuant to Section 230 of the Communications Decency Act, 47 U.S.C. § 230.

The dormant Commerce Clause argument is premature in that it addresses only proposed relief. All the other arguments are without merit.

## II.      The FTC Does Not Seek an Improper Form of Relief

As an initial matter, Defendants claim that the FTC seeks an improper form of relief. The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), which authorizes the FTC to seek, and the Court to order, injunctive relief for violations of the FTC Act. *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1347 (2021). However, Defendants claim that the FTC has improperly asked the court to grant monetary relief for the alleged violations. (Mot. to Dismiss at 15, Dkt. No. 44; Reply at 7 n.3, Dkt. No. 57).

This argument is moot. The FTC has confirmed that only the Plaintiff States are seeking monetary relief in this case, and if a monetary judgment is granted that money will go to the Plaintiff States only. (Opposition Mem. at 1 n.2, 11 n.16; Dkt. No. 56).

End of story.

### III.   The FTC Has Sufficiently Pled Violations of the FTC Act and There is a Clear Case or Controversy

Defendants argue that the FTC's claims must be dismissed because the allegedly improper conduct ended in 2018. (Mot. to Dismiss at 15).[5] On this ground, they assert the same argument in two ways: (1) without any ongoing conduct, there is no case or controversy that provides standing for the FTC, (2) nor has the FTC sufficiently pled that the Defendants are committing or are about to commit violations of the FTC Act. (*Id.*).

However, since the FTC *has* sufficiently pled that Defendants are violating or are about to violate Section 5 of the FTC Act, both of these arguments fail.

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits unfair or deceptive acts or practices in or affecting commerce. Section 13(b) allows the FTC to file suit when it "has reason to believe" a defendant "is violating, or is about to violate, any provision of law enforced by the [FTC]." 15 U.S.C. § 53(b). The FTC need only allege some facts to support a reasonable inference that it has such a "reason to believe." See, e.g., *FTC v. Vyera Pharms.*, LLC, 479 F. Supp. 3d 31, 43–45 (S.D.N.Y. 2020). The facts "may well be subject to diverging interpretations, each of which is plausible . . . . [However,] the choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020)

Plaintiffs' Complaint, written in the present and present perfect tenses, plausibly alleges ongoing violations of Section 5(a) of the FTC Act.: "Since at least 2016, [Defendants] . . . have inundated the internet with tens of thousands of fake positive reviews to bolster their false claims

---

[5] Defendants actually contradict themselves about when the allegedly improper conduct ended. While they first claim that all alleged conduct ended in 2018, (Mot. to Dismiss at 15), they go on to explain that they removed an allegedly false statement about the authentication of their listings in 2020, when they received notice of the FTC's investigation. (Mot to Dismiss at 17).

that properties listed on their Roomster platform are real, available, and verified . . . .
[Defendants] rely on fake reviews . . . and fake listings to get consumers to pay for access to
rental information that is unverified and, in many instances, does not exist." (Compl. ¶¶ 3–4, 42).
The Complaint explains how Roomster makes claims that its listings are verified and
authenticated, when they are not, and advertises fake listings on websites like Craigslist, to
encourage consumers to sign up for the platform's paid service. (*Id.* ¶¶ 22–25, 42). Until they
received notice of the FTC investigation, Defendants claimed on their mobile device applications
to have "millions of verified listings." (*Id.* ¶ 24).

Plaintiffs further allege that Defendants have purchased thousands of fake reviews of
Roomster's platform to to create the false impression that the platform's users were satisfied with
its services and to obscure negative reviews. (Compl. ¶¶ 27–40). Plaintiffs aver that Defendants
posted these reviews or paid others, including the former co-defendant, to do so. (Compl. ¶¶ 29–
30). The Complaint is replete with examples of Defendants Schriber and Zaks directing Martinez
to post fake reviews for Roomster's various applications on the Android and Itunes application
marketplaces. (Compl. ¶¶32–38).

Defendants challenge that they had no knowledge that Martinez's reviews might be
inauthentic and ask this court to take judicial notice of Martinez's website and various news
articles in which Martinez claimed he produced genuine reviews of mobile phone applications.
(Mot. to Dismiss at 13–14, Reply at 12). That is an issue of fact to be litigated. It is certainly not
something of which I can or would take judicial notice. I *can* however, take judicial notice of the
fact that Martinez has admitted to his participation in the scheme alleged by the FTC and has
been enjoined from engaging in this type of behavior.

Drawing all inferences in favor of Plaintiffs, Defendants' conduct strongly suggests they were well aware that the reviews might not generated by genuine users of the platform. Martinez was able to produce thousands of 5-star reviews for Defendants. (Compl. ¶ 30, 34). At one point, Defendants asked Martinez to post 800 reviews of their platform to the app stores, specifying he should only post 15 or 20 in a day. (Comp. ¶ 36). That Martinez had the ability to summon hundreds of five-star reviews of their platform at a moment's notice, and with total control over when and how many would be posted at any one time, strongly suggests to a reasonable reader that the reviews were not being created by genuine, individual users of the platform.

Defendants also argue that this conduct has long since ceased and Section 13(b) "does not permit the FTC to bring a claim based on *long-past conduct* without some evidence that the defendant 'is' committing or 'is about to' commit another violation," *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 156 (3d Cir. 2019) (emphasis added). Defendants say that prior statements that the platform verifies or authenticates users have been removed.[6] For example, the screenshot provided by the FTC, that advertises Roomster's verification process, was removed in early 2020, after Roomster received notice of the FTC's Investigation. (Mot. to Dismiss at 17). And the generation of fake reviews has likewise ended because, as the FTC is aware, their former collaborator Jonathan Martinez and his company AppWinn are permanently enjoined from engaging in this conduct. (*Id.*).

*Shire* is factually inapposite to this matter and offers Defendants no solace. In *Shire*, the FTC alleged that a pharmaceutical manufacturer defendant had submitted numerous frivolous

---

[6] Defendants ask this court to take judicial notice of their website, which they claim shows that they have removed all references to the authentication and verification of their listings. (Mot. to Dismiss at 9–10). I decline to do so. Indeed, there is nothing of which I could take "judicial notice," since determining what may or may not have been removed, and when, would require extensive factfinding.

11

petitions to the FDA to lobby against the approval of a generic version of a drug it manufactured. 917 F.3d at 151–53. *Five years* after the alleged conduct concluded, the FTC sought to obtain injunctive relief against the defendant using § 13(b), claiming that these petitions were anticompetitive behavior. *Id.* at 152, 160. Against this background, the Third Circuit reasoned that a five-year-old violation and some likelihood of recurrence were not sufficient under § 13(b) to show that a defendant is "about to" violate the law. *Id.* at 159.

The present case is vastly different. At the time of filing, the defendant in *Shire* no longer owned the drug for which it had tried to stymie the FDA process. *Id.* As a result, there was no reason to believe it would restart the allegedly improper conduct. *Id.* By contrast, Roomster's platform continues to operate, and per Plaintiffs' pleadings, statements about authentication, fake app store reviews, and fake listings on websites like Craigslist are necessary to Defendants' business. Where the conduct in *Shire* had ceased five years prior to the FTC seeking the injunctive relief, here Defendants claim only that their improper verification claims were removed in early 2020—after they received notice of the ongoing FTC investigation. (Mot. to Dismiss at 17).[7] But Plaintiffs allege that "in numerous instances and on various locations on their website," Defendants continue to represent that the listings are authentic (Compl. ¶ 22). Whether it actually did cease the offending content is not something that can be resolved on a motion to dismiss.

Of critical importance, in *Shire*, the FTC *conceded* that violations were not ongoing. *Id.* Here, however, the FTC alleges that violations are ongoing despite Defendants' claims to the contrary. While Defendants claim that certain false verification statements have been removed

---

[7] Defendants do not assert that, at the time the Complaint was filed, any of the fake listings had been removed from Craigslist or other websites, or the fake reviews had been removed from the various app stores.

and use of Martinez's fake review services ceased prior to the suit's filing, these statements—which may or may not be true—do not establish that no violations of law were occurring at the time of filing. Plaintiffs claim that other false verification statements remain on Defendants' website. And while Defendants may have ceased to engage the services of Martinez, the Complaint does not allege that Defendants only purchased reviews from Martinez—it alleges that Defendants "saturate[d] the internet" with fake reviews "often" (not only) with the help of Martinez, and they "directly *and through others, including Martinez*" posted mass quantities of positive reviews. (Compl. ¶¶ 27, 29, 30) (emphasis added). Other associates remain so the channel of misconduct is not, as the Defendants claim, "defunct or reformed."

In short, Defendants may have their own interpretation of the facts and circumstances, but it is not the court's role to choose between plausible interpretations at the motion to dismiss stage. It is enough that the FTC has plausibly alleged that a violation of the law is occurring.[8]

It is also worth noting that, even if Defendants have ceased the alleged conduct—which is still an issue in dispute—the FTC can still seek a permanent injunction if it plausibly alleges that it has reason to believe that the Defendants are about to commit another violation.

And it has.

Where alleged misconduct has ceased, injunctive relief may still be warranted if future violations of law are likely. *F.T.C. v. Crescent Pub. Grp., Inc.*, 129 F. Supp. 2d 311, 320 (S.D.N.Y. 2001). The FTC has reason to believe Defendants are "about to violate" the FTC Act,

---

[8] The parties make reference to the existence of a "Tolling Agreement," that may make inconsequential any post-investigative corrective conduct. (Opp. at 12 n.8). The parties do not agree what the terms of this "agreement" are, (*Id.*; Reply at 8 n.4), and neither side has deigned to provide the court with a copy. However, as the complaint does not rely on this agreement, and Plaintiff FTC sufficiently pleads ongoing violations of the FTC Act, the proper interpretation of this Tolling agreement need not be adjudicated.

13

if there is a realistic likelihood of recurrence. *Fed. Trade Comm'n v. Shkreli,* 581 F. Supp. 3d 579, 638 (S.D.N.Y. 2022) (citing *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)). "In determining the likelihood of recurrence, courts consider factors such as the degree of scienter involved; the isolated or persistent nature of past fraudulent acts; the defendants' appreciation of wrongdoing; and the defendants' opportunities to commit future violations." *Fed. Trade Comm'n v. Shkreli,* 581 F. Supp. 3d 579, 638 (S.D.N.Y. 2022) (quoting *Sec. & Exch. Comm'n v. Commonwealth Chem. Sec., Inc.,* 574 F.2d 90, 100 (2d Cir. 1978)).

In addition to alleging ongoing violations, the Complaint demonstrates a realistic likelihood of recurrence given Defendants' pattern of willful and deliberate behavior over the course of several years, as well as the continued ownership and control of Roomster by the two named individual Defendants who run the company. The Complaint specifically alleges that Defendants have engaged in unlawful conduct "willfully," "knowingly," "repeatedly," and unabated for a long period of time, "since at least 2016," "despite knowledge of numerous complaints and this investigation." (Compl. ¶¶ 3, 45). For example, Defendant Shriber personally "instructed [] Martinez to produce 'lots of 5 star IOS app reviews'" and directed Martinez "to spread out the reviews to be 'constant and random.'" (*Id.* at ¶¶ 33–38). The Complaint also quotes emails in which Defendants specify when and where precise numbers of allegedly fake reviews should be posted. *Id.*

Defendants do not appreciate the seriousness of the allegations against them, as they continued to order the dissemination of reviews by Martinez even after notice of the FTC's investigation. (Compl. ¶ 38). And Defendants demonstrated a lack of candor with FTC investigators, claiming that they do not pay for reviews of the Roomster platform while they purchased 20,000 from Martinez alone. (Compl. ¶ 30).

Defendants clearly have opportunities to restart whatever conduct they may have stopped; they simply need to update their website to assert new false authentication claims. And while Jonathan Martinez may no longer provide fake reviews to Defendants, Plaintiffs allege that Defendants and other third parties also generate these fake reviews, and fake Craigslist listings, and there would be no bar to their doing so again. In *Fed. Trade Comm'n v. Vyera Pharms. LLC*, the court found that the individual defendants were violating or about to violate the law because they designed and implemented the offending system and still held leadership positions and decision-making power. 2020 WL 4891311, at *45 (S.D.N.Y. Aug. 18, 2020). Recurring violations are hardly implausibly where, as here, defendants retain control of the company and the capabilities allegedly used to violate the FTC Act.

Defendants also have a strong pecuniary interest in restarting the alleged misconduct, as their business has generated tens of millions of dollars from users signing up for their paid subscription, allegedly enticed by the deceptive or misleading conduct described. (Compl. ¶ 44). Indeed, Plaintiffs' allegations suggest that Roomster's business relies on the consumer belief that listings on the platform are genuine; without the renewed promises of authentication, positive reviews, and Craigslist referrals consumers are less likely to pay for subscriptions to the platform.

Finally, Defendants cannot moot the case or destroy the FTC's standing by offering a stipulation to a permanent injunction if any illegal conduct is ongoing. *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 162 (2016). The FTC is not obliged to accept their offer and it does not lose standing merely because it chooses to decline Defendants' offer, genuine or not. Defendants further argue that the FTC is attempting to "bypass" the Supreme Court by bringing this case jointly with Plaintiff States, alleging that it is using the state claims for monetary damages to

bootstrap jurisdiction over its own claims. (Dkt. No. 44 at 15, 20 n.3). There is nothing improper about bringing an enforcement action together with states whose own consumer protection statutes has been violated by allegedly unlawful conduct.

The FTC has clearly shown that it has reason to believe Defendants are violating the FTC Act through ongoing conduct or, at the very least, that they are about to violate the law given the high likelihood of recurrence. There is also clearly a case or controversy for this court to decide.

## IV.    The FTC Has the Constitutional Authority to Seek a Permanent Injunction Against Defendants

Defendants next contend that the FTC's claims must be dismissed because Section 13(b) of the FTC Act is unconstitutional. Section 13(b) authorizes the FTC to bring actions seeking injunctive relief for violations of the FTC Act. Defendants argue that Section 13(b) is an improper delegation of executive power to an independent agency whose commissioners cannot be removed at will by the president. (Mot. to Dismiss at 18).

Defendants grossly misinterpret binding Supreme Court precedent. The FTC clearly has the authority to bring this suit.

Nearly a century ago, the Supreme Court affirmed the constitutionality of the FTC's structure, when it decided that Congress could protect the independence of the FTC by legislating that its commissioners could only be removed for cause. *Humphrey's Executor v. United States*, 295 U.S. 602, 632 (1935). Since then, the Supreme Court has addressed presidential removal power multiple times, each time citing *Humphrey's Executor* and declining to overrule it—including in *Seila Law*, the case relied upon by Defendants. *See Collins v. Yellen*, 141 S. Ct. 1761, 1786–87 & n.21 (2021); *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2192, 2198–

16

200 (2020). *Humphrey's Executor* therefore remains "an entrenched Supreme Court precedent, protected by stare decisis," *In re Aiken Cnty.*, 645 F.3d 428, 446 (D.C. Cir. 2011) (Kavanaugh, J., concurring), one that only the High Court has the prerogative of overriding. *Agostini v. Felton*, 521 U.S. 203, 237 (1997).

Defendants contend that *Humprey's Executor* stands only for the far narrower proposition that the FTC's structure and powers were constitutional at the time of the decision, i.e., in 1935, before it was given the authority to file suit for injunctive relief pursuant to Section 13(b). (Mot. to Dismiss at 18). While Congress may vest certain quasi-legislative or quasi-judicial powers in an independent agency such as the FTC, they argue that *Seila Law* holds that Congress cannot vest *any quintessentially executive powers* in an agency run by principal officers who can only be removed for cause. As a result, they argue that Section 13(b) is an "unconstitutional statutory amendment" that was "void when enacted," and grants no power that can be exercised here. *Barr v. Am. Ass'n of Pol. Consultants*, 140 S. Ct. 2335, 2353 (2020) (AAPC) (plurality op.) (citations omitted); *see also Bowsher v. Synar*, 478 U.S. 714, 734–35 (1986).

This interpretation is mistaken on a number of levels. However, the only misunderstanding I need address here is the assertion that the FTC cannot exercise its Section 13(b) authority if the removal protections for its principal officers are unconstitutional. The Supreme Court has never suggested, in *Seila Law* or subsequent cases, that Congress lacks constitutional authority to delegate regulatory power to an independent agency; it has only held Congress has limited authority to restrict the President's removal power. 40 S. Ct. 2183, 2199 (2020). In *Free Enterprise Fund v. Public Company Accounting Oversight Board*, the Court held that the Oversight Board's regulatory authority "*does not violate the separation of powers*, but the substantive removal restrictions [for its officers] . . . do." 561 U.S. 477, 508–9 (2010)

17

(emphasis added). Similarly, in *Morrison v. Olson*, the Supreme Court upheld the grant of criminal prosecution authority to an independent counsel not removable at will by the President. 487 U.S. 654, 696–97 (1988).

As a result, even where Congress has legislated unconstitutional removal protections, an agency can still wield enforcement authority that was lawfully delegated. *Collins v. Yellen*, 141 S. Ct. 1761, 1787–88 & n.23 (2021); *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2208–10 (2020). "Settled precedent . . . confirms that the unlawfulness of [a] removal provision does not strip the [officer] of the power to undertake the . . . responsibilities of his office." *Collins*, 141 S. Ct. at 1788 n.23.

Thus, even if Defendants could plausibly challenge the constitutionality of the for cause removal protections for the FTC commissioners, that challenge would not invalidate this action or necessitate its dismissal.

However, the FTC's commissioners were appointed consistent with the requirements of the Appointments Clause, U.S. Const. art. II, § 2, cl. 2. An unconstitutional removal restriction would provide "no reason" to void this action. *Collins*, 141 S. Ct. at 1787. Accordingly, Defendants' argument that the FTC's for cause removal restriction is unconstitutional is patently wrong and does not warrant dismissal. If Defendants wish to persist in their challenge to the constitutionality of the FTC, they may do so on appeal from a final judgment.[9]

Defendants' motion to dismiss the FTC's claim is, therefore, denied. As the state claims are sufficiently related to the FTC's action to make it appropriate to exercise supplemental

---

[9] To put the matter to rest, this court will *not* certify an interlocutory appeal to the Second Circuit on the basis of this baseless argument.

jurisdiction over them, I will do so. 28 U.S.C. § 1367. We may revisit the issue of whether to

send the various state claims back to their respective states for trial at a later date [10]

## V.     The Allegedly Fraudulent Reviews Qualify as Deceptive Acts under the Applicable State UDAP Laws

Defendants argue that the Plaintiff States have failed to state claims that the allegedly

fraudulent reviews are "deceptive acts," in violation of their respective state laws. The State

UDAP Law claims also arise out of Defendants deceptively and falsely advertising rental

listings as "verified," "authentic," and "available." Defendants' Motion raises no argument

whatsoever about the sufficiency of those allegations, which are independently sufficient to

allege violations of the State UDAP Laws prohibiting false advertising. *See supra* note 2.

Generally, State UDAP laws say that acts are "deceptive" if the conduct in question has

the capacity to deceive or is likely to deceive reasonable consumers. The Plaintiff States'

UDAP laws differ on the requirement of a reasonable consumer standard. However, since

Plaintiffs plausibly allege that it was reasonable for consumers to rely on the reviews, I will

proceed with the analysis based on the strictest "reasonable consumer" standard, which is the

one required by the New York General Business Law § 349, Florida Deceptive and Unfair

Trade Practices Act, and Illinois Consumer Fraud and Deceptive Business Practices Act.[11]

---

[10] Defendants suggest that, even if the FTC claims survive, I should decline to exercise supplemental jurisdiction over the state claims for exceptional circumstances, 28 U.S.C. § 1367(c)(4); specifically, because the FTC should not be able to "bootstrap" Supreme Court precedent forbidding the FTC from seeking monetary relief. (Mot. to Dismiss at 20 n.3). This makes no sense because, as previously discussed, the FTC says it is not seeking monetary relief. And there is nothing improper about bringing an enforcement action with states whose own consumer protection statutes has been violated by allegedly unlawful conduct. There is nothing exceptional about these circumstances. This sort of thing happens all the time.

[11] Most of the state UDAP laws do not require this standard: The N.Y. Exec. Law § 63(12) fraud standard "is whether the targeted act has the capacity or tendency to deceive." People v.

Defendants argue that plaintiffs have not plausibly alleged violations of the State UDAP laws

because it would be unreasonable for consumers to rely on *subjective user-supplied* reviews

when deciding whether they should purchase a paid Roomster account. (Mot. to Dismiss at

23).[12]

---

N. Leasing Sys., Inc., 37 N.Y.3d 1088, 178 N.E.3d 935 (2021); N.Y. Gen. Bus. Law § 349
deception standard is whether deceptive practice is "likely to mislead a reasonable consumer
acting reasonably under the circumstances." *Himmelstein, McConnell, Gribben, Donoghue &
Joseph, LLP v. Matthew Bender & Co.*, 37 N.Y.3d 169, 178 (N.Y. 2021); To state a claim
under Cal. Bus. & Prof. Code, §§17500 *et. seq.*, a plaintiff need only "show that members of
the public are likely to be deceived by the advertisement." *Davis v. HSBC Bank*, 691 F.3d
1152, 1162 (9th Cir. 2012) California courts construe Section 17500 to extend beyond literal
falsities to include "not only advertising which is false, but also advertising which, although
true, is either actually misleading or which *has a capacity, likelihood or tendency to deceive or
confuse the public.*" *Id.* (quoting *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir.
2008)) (quotations omitted) (emphasis added) And "California's unfair competition law (UCL)
(§ 17200 et seq.) defines 'unfair competition' to mean and include . . . any act prohibited by the
false advertising law (§ 17500 et seq.) . . . [so] any violation of the false advertising law . . .
necessarily violates the UCL." *Kasky* 45 P.3d at 249–50; A false or misleading statement
violates the Colorado Consumer Protection Act, Colo. Rev. Stat. Ann. § 6-1-105(1), when it has
the "capacity or tendency to deceive, even if it did not." *Rhino Linings USA, Inc. v. Rocky
Mountain Rhino Lining, Inc.*, 62 P.3d 142, 148 (Colo. 2003); An Attorney General's Florida
Deceptive and Unfair Trade Practices Act complaint need only allege that defendants "engaged
in unconscionable, unfair or deceptive acts or practices likely to deceive a consumer acting
reasonably under the circumstances. " *State of Fla., Off. of Att'y Gen., Dep't of Legal Affairs v.
Commerce Commercial Leasing, LLC*, 946 So. 2d 1253, 1258 (Fla. Dist. Ct. App. 2007); Under
Illinois' Consumer Fraud and Deceptive Business Practices Act, "[c]onduct is deceptive 'if it
creates a likelihood of deception or has the capacity to deceive' a 'reasonable consumer.'"
*Mashallah, Inc. v. W. Bend Mut. Ins.*, 20 F.4th 311, 322 (7th Cir. 2021). The reasonable
consumer standard requires a probability "that a significant portion of the general consuming
public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Bell
v. Publix Super Markets, Inc.*, 982 F.3d 468, 474–75 (7th Cir. 2020) (quoting *Beardsall v. CVS
Pharmacy, Inc.*, 953 F.3d 969, 972–73 (7th Cir. 2020)). An act or practice is deceptive under
Mass. Gen. Law ch. 93A if it "has the capacity or tendency or effect of deceiving" consumers.
940 Mass. Code Regs. 3.05(1); An "advertisement is deceptive when it has the capacity to
mislead consumers, acting reasonably under the circumstances, to act differently from the way
they otherwise would have acted." *Aspinall v. Phillip Morris Cos.*, 813 N.E.2d 476, 488 (Mass.
2004).

[12] In a footnote of their reply, Defendants argue for the first time that there is no factual basis for
the Plaintiff States' claims because the FTC has neither obtained their consent nor notified
Defendants of its intent to share its investigative record with the Plaintiff States. (Reply at 6 n.2;

The complaint does not, as Defendants imply, allege that authentic consumer reviews of Roomster are deceptive or misleading. Rather, it alleges that Defendants' dissemination of fake reviews is likely to deceive a reasonable consumer because the reviews appear to be, but are not, truthful representations made by actual users of the Roomster platform, and because they obscure authentic negative reviews. *See, e.g.*, Compl. ¶¶ 39–40. As discussed above, the Complaint more than plausibly alleges that Defendants have created or purchased fake reviews and directed they be posted across the internet, for the purpose of deceiving consumers. These allegations are more than sufficient to state a claim under each of the state UDAP laws.

Defendants cite a number of cases from the state jurisdictions for the proposition that user reviews, as subjective opinions, can be actionable misrepresentations. Whether any of the statements in the user reviews are actionable misrepresentations is an issue for trial, not a motion to dismiss. These authorities are also irrelevant to the present case because they involve misrepresentation claims for vague, generalized or unspecified corporate slogans or promises in

---

Dkt. No. 57). The court will disregard this argument because "it is well settled in the Second Circuit that a party may not raise an argument for the first time in his reply brief." *Anghel v. Sebelius*, 912 F. Supp. 2d 4, 14 (E.D.N.Y. 2012) (*quoting Morgan v. McElroy*, 981 F.Supp. 873, 876 n. 3 (S.D.N.Y.1997)).

Defendants also argue, again for the first time in their reply, that the Plaintiff States have failed to plead allegations of "real injury" in their complaint. (Reply at 12–13). As mentioned, it is not appropriate to raise an argument for the first time in a reply. *Anghel*, 912 F. Supp. 2d at 14. Moreover, Plaintiffs *have* plausibly alleged real injury. Defendants claim that no consumer harm can be shown from because the Roomster is "free." (Reply at 13). And it is true that, per Section 230 of the Communications Decency Act, Defendants cannot be held liable for injuries caused by illegal or fraudulent content posted by users of their platform, i.e., users getting scammed for their rent money. *See infra* Part VIII. However, as Defendants concede, while free users may see possible listings, users must sign up for a paid subscription in order to actually contact the listing creator about the rental. (Mot. to Dismiss at 10–11). Plaintiffs plausibly allege consumers suffered financial harm when they paid for access to the Roomster platform based on the misleading or deceptive reviews.

advertisements held to be "mere puffery." *Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017, 1026 (N.D. Cal. 2012); *Perret v. Wyndham Vacation Resorts, Inc.*. 889 F. Supp. 2d 1333, 1342 (S.D. Fla. 2012); *Edmunson v. Procter & Gamble Co.*, 2011 WL 1897625, at *3 (S.D. Cal. May 17, 2011); *Renfro v. Champion Petfoods USA, Inc*, 25 F.4th 1293, 1304 (10th Cir. 2022); *Azurity Pharms., Inc. v. Edge Pharma, LLC*, 45 F.4th 479, 504 (1st Cir. 2022).[13]

Here, the allegation is that the reviews are fraudulent because they are not opinions at all—they are *fake*, written by someone who was not a real customer and so who was in no position to offer an opinion. Misrepresentations that are false because they are not real—they were made up and paid for—can never by definition be "puffery."

In the only arguably analogous case cited by Defendants—*Casper Sleep, Inc. v. Nectar Brand LLC*—favorable consumer reviews written by third party reviewers were alleged to be misleading because the parties had failed to disclose that they had a financial relationship and influence with the reviewers. *Casper Sleep, Inc. v. Nectar Brand LLC*, 2020 WL 5659581, at *6–7, 9 (S.D.N.Y. Sept. 23, 2020). The court did note that certain cited statements in reviews were mere opinions, and thus not actionable misrepresentations, *Id.* at *6, 9. However, the court ultimately concluded that the allegations were "not actionable under the Lanham Act [or NY GBL §§ 349 and 350] because the [third-party reviewer] websites disclosed [the financial relationships]. *Id.* at *7, 9.

---

[13] The one remaining authority, though not dealing in corporate puffery, is similarly factually inapposite. In *Field Rooftops, LLC v. Chi. Cubs Baseball Club, LLC*, plaintiffs claimed to be harmed by a negative metaphor used by one defendant in a public statement, to describe a contentious business relationship with the Plaintiff. 136 F. Supp. 3d 911, 918–19 (N.D. Ill. 2015). The court held that the statement was obviously not a factual misrepresentation because it was a metaphor, and figures of speech are not statements that can be factually verified. *Id.* It seems unnecessary to remark that Plaintiffs are not accusing Defendants of misleading consumers using metaphors (or similes, or puns, or any other figures of speech).

Here, the tens of thousands of reviews in question are not alleged to be subjective opinions of third-party reviewers, who were paid to write their reviews but failed to disclose their compensation. These reviews were allegedly manufactured wholesale at the direction and control of the Defendants and its agents—a fact they clearly do not disclose to consumers.

And the *Casper Sleep* court itself suggested that the scenario presented by this case—the large-scale manipulation of reviews in an app store—would constitute false advertising under the Lanham Act. In a separate counterclaim, the defendant alleged that the plaintiff or its agents had engaged in a systematic practice of manipulating online reviews on Google and Amazon, creating "the false and misleading impression with consumers that Plaintiff had received more positive consumer reviews than it actually had." *Casper Sleep*, 2020 WL 5659581, at *10–11. The court dismissed this counterclaim, not because such manipulation would not constitute false advertising, but because the Defendant had not alleged sufficient facts that Plaintiff had manipulated these online reviews. *Id.* at *11.

Even if Defendants had just paid real consumers to use and review the platform, as they claim, such conduct would still plausibly qualify as misleading or deceptive acts. Indeed, the failure to sufficiently disclose such a financial relationship is exactly the sort of allegation the *Casper Sleep* court indicated could give rise to violations of the Lanham Act and NY GBL §§ 349 and 350. *Id.* at 6-7. And as the Ninth Circuit also recently observed, "when someone falsely claims to be independent, rigs the ratings in exchange for compensation, and then profits from that perceived objectivity, that speaker has drowned the public trust for economic gain." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1118 (9th Cir. 2021).

Indeed, Courts have repeatedly found manufactured reviews to be misrepresentations under the Lanham Act. In *Pegasystems, Inc. v. Appian Corp.*, 424 F. Supp. 3d 214 (D. Mass.

Dec. 5, 2019), the plaintiff – a software company – brought a Lanham Act claim challenging a report used by defendant in advertising. The report – which had been commissioned by the defendant – compared the defendant favorably to plaintiff and other competitors. The "commission [was] not disclosed anywhere in the [r]eport or any public communications about it," however. Id. at 219–20. The court in *GOLO, LLC v. HighYa, LLC*, 310 F. Supp. 3d 499 (E.D. Pa. 2018), noted that "liability can arise under the Lanham Act" for "sham" websites purportedly operated by a third parties. *Id.* at 505.

At a bare minimum, it would have been reasonable for consumers to assume that the existence of thousands of reviews of the Roomster platform meant that there are or had been thousands of actual users. And the presence of thousands of users on the platform would reasonably make a consumer more inclined to think she could find a rental on the platform and sign up for Roomster's paid services (of course, if she knew that these reviews had been generated by the owners of the platform, she might be less inclined to sign up for these services). The Complaint more than plausibly alleges that Defendants violated each of the State UDAP laws by knowingly purchasing fake reviews and having them disseminated across the internet, for the purpose of deceiving consumers.

## VI.    New York Has Sufficiently Pled Violations of the NYGBL §§ 349, 350 and NYEL § 63(12)

In Complaint Counts III and IV, New York alleges that Defendants engaged in deceptive acts and practices under N.Y. General Business Law ("NYGBL") § 349 and false advertising under § 350, as well as fraudulent and illegal conduct under N.Y. Executive Law ("NYEL") § 63(12). Defendants argue that New York has failed to state a claim for violations of NYGBL §§

349 and 350 and NYEL § 63(12) because it must allege sufficient details to show that consumers were deceived in the State of New York. (Mot. to Dismiss at 27).

Defendants misinterpret the standard. And by the correct standard, New York has sufficiently pled these violations

The New York consumer protection statutes have territorial limitations, prohibiting deceptive acts or false advertising conduct "in this state." NYGBL §§ 349(a), 350.[14] However, Defendants, relying on *Goshen v. Mut. Life Ins. Co.*, 774 N.E.2d 1190 (N.Y. 2002) and its progeny, interpret those territorial limitations as far narrower than they are, in this case requiring the New York to allege that the *actual deception* of a consumer occurs in the state. (Mot. to Dismiss at 27).

The Second Circuit has made clear that, under *Goshen* and the cases construing it, a deceptive transaction in New York will fall within the territorial reach of Sections 349 and 350 as long as, "some part of the underlying transaction . . . occurs in New York State." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 123–24 (2d Cir. 2013) (*quoting Mountz v. Global Vision Prods., Inc.*, 770 N.Y.S.2d 603, 608 (Sup. Ct. 2003)).

And even before *Cruz*, courts consistently limited *Goshen*'s application in § 349(b) Attorney General actions and have allowed such claims to proceed so long as "at least some part" of the deception took place in New York. *People v. Nat'l Home Protection, Inc.*, 2009 N.Y. Misc. LEXIS 3667, at *8–*9 (N.Y. Sup. Ct. Dec. 8, 2009); see also *People ex rel. Spitzer v.*

---

[14] The territorial limitations of EL § 63(12) are not obvious. Unlike NYGBL §§ 349 and 350, the text of NYEL §63(12) does not include territorial limitations. However, in the instant matter, it is unnecessary for this court to determine whether §63(12) requires some part of the deceptive transaction to occur in New York state because, as I describe *infra*, Plaintiffs have already sufficiently alleged that enough of the transaction occurred here.

*Telehublink Corp.*, 301 A.D.2d 1006, 1009–10 (2003). For this reason, Defendants' reliance on *Goshen* and its progeny is misplaced because, in those cases, claims were brought by consumers, pursuant to 349(h), and not by the New York Attorney General acting pursuant to the executive law. *Vyera*, 2021 WL 4392481, at \*4.

"The appropriate test under the NYGBL is not where the alleged deception took place or where the parties reside, but instead the location of the transaction, and in particular the strength of New York's connection to the allegedly deceptive transaction." *Fishon v. Peloton Interactive, Inc.*, 2021 WL 2941820, at \*3 (S.D.N.Y. July 12, 2021). Notably, Defendants do not cite a single case in which a § 349(b) action such as this was dismissed on the pleadings for failure to allege an adequate in-state nexus, except for *People v. Direct Revenue, LLC*, 862 N.Y.S.2d 816, 816 (N.Y. Sup. Ct. 2008). However, *Direct* Revenue is legally inapposite because it involved a special proceeding decided "in accordance with the standards for granting summary judgment," and factually inapposite because the only evidence presented connecting the transactions to the state was that New York was the Defendant's principal place of business.

There are a number of possible connections to New York that might expose a transaction to the territorial jurisdiction of §§ 349, 350, and 63(12). In *National Home Protection*, the court found that the NYAG had the jurisdiction to pursue the Defendant for violations of NYGBL §§ 349 and 350 and NYEL § 63(12) because (1) the Defendant was a New York corporation and operated from a single office in New York; (2) it solicited business and service customers using telephones in New York; (3) made allegedly false and misleading statements in those telephone conversation; and (4) directed customers to send correspondence to their New York office. 2009 N.Y. Misc. LEXIS 3667, at \*8–\*9 (N.Y. Sup. Ct. Dec. 8, 2009). And, in *Telehublink*, the court found that the NYAG could bring an action pursuant to § 349(b) and §63(12), even on behalf of

non-residents, on the grounds that the Defendant had used a New York address to send and
receive correspondence relating to its telemarketing scheme. 301 A.D.2d at 1009–10.

The Complaint more than plausibly alleges that "at least some part" of the deceptive
transactions occurred in New York. Roomster transacts business and has its principal place of
business in New York. (Compl. ¶16). Roomster's owners and co-founders, who also serve as
Roomster's Chief Executive Officer and Chief Technology Officer, reside in this District and
transact business here. (Compl. ¶¶ 17–18). As Defendants Shriber and Zaks exercise control over
the business operations of Roomster and are responsible for approving Roomster-supplied
platform content, (*Id.*), plaintiffs have plausibly alleged that at least some part of the
development, approval, implementation, and financing of the alleged misconduct happened, and
is happening, in New York.

## VII.   Defendants' Challenge to the Constitutionality of the Remedy for New York's Claims is Premature

As discussed, New York alleges violations of NYGBL §§ 349 and 350 and NYEL §
63(12). Along with the other Plaintiff States, New York seeks monetary relief, including
"restitution to injured consumers nationwide as provided under state law. (Compl. ¶ B). New
York law authorizes broad relief for such claims brought pursuant to NYGBL §§ 349 and 350
and NYEL § 63(12), including injunctions, restitution, damages, and disgorgement. *New York v.
Greenberg*, 27 N.Y.3d 490, 495–98 (N.Y. 2016).

Defendants claim that any future order that would provide for "nationwide restitution" on
the basis of New York state law would violate the dormant Commerce Clause. (Mot. to Dismiss
at 17–20).

27

This argument is grossly premature at the motion to dismiss stage. Plaintiffs need only plausibly allege that Defendants are "liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). There is no requirement that Plaintiffs demonstrate at the pleading stage that they are entitled to each form of relief sought. *See, e.g., Norwalk CORE v. Norwalk Redev. Agency*, 395 F.2d 920, 925–26 (2d Cir. 1968). Indeed, the Federal Rule of Civil Procedure 8(a)(3) demand for relief is distinct from the Rule 8(a)(2) claim for relief, *Pavers & Rd. Builders Dist. Council Welfare Fund v. J. Pizzirusso Landscaping Corp.*, 2018 WL 2186481, at *3 (E.D.N.Y. May 11, 2018), and should not be considered part of claims while determining motions challenging the sufficiency of claims alleged in a complaint. CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. CIV. § 1255 (3d ed.). Under Rule 54(c), any future judgment will grant a party only the relief to which the party is entitled, whether demanded in the pleadings or not.

Accordingly, Defendants' challenge to the scope of a potential restitutionary remedy affords no basis for dismissal. See *Burkina Wear, Inc. v. Campagnolo, S.R.L.*, 2008 WL 1007634, at *3 (S.D.N.Y. Apr. 9, 2008). Defendants are free to challenge the constitutionality of nationwide monetary relief, if and when such relief is granted.

## VIII.   Defendants Are Not Immune from Liability Pursuant to Section 230 of the Communications Decency Act

Finally, Defendants argue that that Roomster is a "provider of an interactive computer service" and is shielded from liability for inaccuracies in user-supplied content pursuant to Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230. As a result, they cannot be held liable for allegedly fake listings on their platform, nor the content of the reviews provided by their users. (Mot. to Dismiss at 23–24).

But Section 230 does not immunize Defendants from liability for their own unlawful conduct.

Section 230(c)(1) prohibits treating an interactive computer service ("ICS") provider as a publisher or speaker of any information provided by an information content provider ("ICP"). As a result, an ICS will not be held liable for illegal or tortious information provided an ICP. An ICS is broadly defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet." § 230(f)(2). By contrast, an ICP is broadly defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." § 230(f)(3).

In applying the statute, courts have "broken [it] down into three component parts," finding that "[Section 230] shields conduct if the defendant (1) 'is a provider or user of an interactive computer service, (2) the claim is based on information provided by another information content provider and (3) the claim would treat [the defendant] as the publisher or speaker of that information.'" *LeadClick*, 838 F.3d at 173. Website hosting services and social networking sites like Facebook.com, or even online roommate matching services like Roommates.com, are often held to be interactive computer services. *Mosha v. Facebook Inc.*, 2021 U.S. Dist. LEXIS 12306, at *6–7 (S.D.N.Y. Jan. 22, 2021) (collecting cases); *see also Grindr*, 306 F. Supp. 3d at 588. Dismissal of a complaint may be appropriate where it is clear from the face of the complaint that Section 230 would bar liability. *Herrick v. Grindr LLC*, 765 F. App'x 586, 591 (2d Cir. 2019).

However, Section 230 only provides immunity "if the interactive service provider is not also an 'information content provider' of the content which gives rise to the underlying claim." *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 174, 176 (2d Cir. 2016). An ICS can be held liable for offensive content on its service or system if it contributes to the "development of what [makes] the content unlawful." *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 589 (S.D.N.Y. 2018). As a result, a defendant ICS is not entitled to § 230 immunity for its own deceptive acts or practices, or its direct participation in a deceptive scheme. *LeadClick*, 838 F.3d at 176. An interactive computer service is responsible for the development of the information at issue in the case if they "'directly and materially' contributed to what made the content itself 'unlawful.'" *Force v. Facebook*, 934 F.3d 53, 68 (2d Cir. 2019) (*quoting LeadClick*, 838 F.3d at 174).

Defendants once again sidestep the actual allegations made against them. Plaintiffs' complaint does not attempt to hold Defendants liable for the fact that someone else put fake listings on their website. They charge that Defendants themselves advertise on their platform that all listings are "verified and authentic," when they are not, (Compl. ¶¶ 22–24), and arranged for third parties to create and post fake reviews about their website, (Compl. ¶¶ 27, 29, 33–38). Defendants are alleged to have been involved in hiring the creators of the reviews, paying them to create the reviews (Martinez and others), and specifically instructing how and when the reviews should be posted. *LeadClick*, 838 F.3d at 176. Similarly, insofar as Plaintiffs' deception claims capture fake listings on other websites that direct consumers to the Roomster platform, such as Craigslist, (Compl. at ¶ 42), Defendants are responsible as the creators that unlawful content. That is all actionable conduct not barred by Section 230.

Finally, Plaintiffs sufficiently allege that Defendants made these statements to entice users to pay for subscriptions to Roomster's services, a concrete financial harm.

30

Section 230 does not afford Defendants' immunity for any of the misconduct alleged. Defendants' motion to dismiss is DENIED.

## IX.    Defendants' Motions for a Stay of Discovery and a Protective Order Are Denied

Having denied Defendants' motion to dismiss, Defendants' motion to stay discovery is denied as moot.

Finally, Defendants move for a protective order, pursuant to Rule 26(c), to permit the parties to designate certain materials as confidential. The parties have been unable to agree on the terms of a protective order. That certainly does not bother me. This court does not believe in protective orders, since parties abuse them by designating material that is manifestly not "trade secret" as "confidential" – which generally prevents the public from seeing things that will never be kept confidential on a summary judgment motion or at trial, but that are simply embarrassing or worse. And they create more work for me, since I have to work through the confidentiality issue at a later date, which simply wastes my time.

So if the parties are unable to agree on the terms of a protective order, none will be issued, because this court will not impose one unilaterally. And if parties refuse to turn over documents unless on the ground that they are confidential but not subject to a protective order, the court will entertain a motion by the party requesting the documents for an order precluding the uncooperative party from making arguments that might be supported by the withheld documents, or an order deeming certain facts to be admitted by the non-producing party.

## CONCLUSION

Based on the foregoing, Defendants' motions for dismissal, to stay discovery, and for a protective order are DENIED.

31

The Clerk of Court is respectfully directed to remove the motions at Dkt. Nos. 43 and 58 from the Court's list of open motions.

Dated: February 1, 2023

_____

U.S.D.J.

BY ECF TO ALL COUNSEL